IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA, ex rel.
BRIAN VINCA and JENNIFER STAUP
SWEENEY,

     Plaintiff,

                           Case No.: 8:11-cv-176-T-30MAP

v.

ADVANCED BIOHEALING, INC.,

     Defendant.

_____/

## RELATOR BRIAN VINCA'S AMENDED RESPONSE TO NOTICE OF ATTORNEYS' CHARGING LIENS BY BARRY A. COHEN, P.A., SAADY & SAXE, P.A., AND KEVIN J. DARKEN

**NOW COMES** Relator, BRIAN VINCA (hereinafter referred to as "VINCA"), by and through his undersigned counsel, and hereby files his amended response to the Notice of Attorneys' Charging Liens filed by Barry A. Cohen, P.A., Saady & Saxe, P.A., and Kevin J. Darken [DE 167] (hereinafter referred to as the "Notice of Lien"), and states as follows:

## FACTUAL BACKGROUND

On January 12, 2011[1], Vinca entered into a Contract for Legal Representation (hereinafter referred to as the "Retention Agreement") with the law firm Cohen, Foster & Romine, P.A.[2] The Retention Agreement included a provision authorizing Claire Saady of Saady & Saxe, P.A.

---

[1] It is unclear why Vinca's Former Counsel allege that the Retention Agreement was entered into by Vinca on November 3, 2010 [DE 167 ¶1]. The agreement was clearly executed on the following dates with respect to all parties involved:

| | |
|---|---|
| Brian Vinca | January 12, 2011 |
| Jennifer Sweeney | January 23, 2011 |
| Kevin J. Darken | January 25, 2011 |
| Claire Saady | January 27, 2011 |

[2] Cohen, Foster & Romine, P.A. is the predecessor of Barry A. Cohen, P.A.  Barry A. Cohen P.A. was administratively dissolved by the Florida Division of Corporations on September 28, 2018, for failure to file its annual report.

(together hereinafter referred to as "Saady") as additional counsel also representing Vinca in all aspects of trial.  While the Notice of Lien does not mention the percentage they demand, the erstwhile firm of Barry A. Cohen, P.A. (hereinafter referred to as "Cohen"), Saady, and Kevin J. Darken (hereinafter referred to as "Darken") (together with Saady and Cohen, collectively referred to herein as "Former Counsel") are seeking a contingent fee of forty (40%) percent of Vinca's total recovery in this matter, with thirty (30%) percent allocated to Cohen, together with Darken, and the remaining ten (10%) percent allocated to Saady.  Curiously, the entities with whom Vinca contracted directly no longer exist, other than Saady, the "referring" firm.

On March 21, 2018, Vinca terminated the representation of Former Counsel, and for good cause (*infra*).  Nonetheless, while Former Counsel erroneously assert that they "fully performed the work set forth in the Retention Agreement," Former Counsel also assume, in conclusory fashion and without legal rationale, that Vinca's decision to terminate Former Counsel was "without cause."  [DE 167 ¶19]  In actuality, there are several factors laid out below which this Court should consider when determining whether Former Counsel, together and individually, are entitled to charging liens, along with several salient fact which belie Former Counsel's claims to fee entitlement.

**I.**     **Darken asserts a claim to his own interest or entitlement to an alleged separate agreement for attorneys' fees between himself and his employer which is wholly irrelevant: he is not entitled to an individual charging lien in this matter.**

In the Notice of Lien, Darken asserts that he has an internal, private compensation arrangement with Cohen as it relates to the instant litigation. (See ¶ 5, Notice of Lien).  Darken declares that this internal compensation arrangement grants Darken a right to file his own independent charging lien in this case, even though at all times material, he was acting as an associate and employee of Cohen's firm.  At no time was Darken hired as individual counsel to

represent Vinca.  [DE 167¶5]  Stated otherwise, Vinca never contracted with Darken individually and therefore Darken's lien against Vinca is unlawful.  Instead, Darken's premise that he can file an individual claim against Vinca's award is based upon a separate and theoretical internal agreement between Darken and his former employer, Cohen.  Darken did not produce any documentation or demonstrate the existence of any other evidence to substantiate this alleged internal compensation arrangement with Cohen, and the Cohen firm no longer exists.

*Travelers Property Casualty Co. of America v. Paramount Lake Eola, L.P.*, 2010 WL 2977981 (M.D. Fla. June 21, 2010) is the sole case relied upon by Darken in his effort to support his premise that he is entitled to file his own independent charging lien in the case.  At first blush, this case does appear similar.  In *Travelers*, on behalf of the associate, the trial court found that an internal compensation arrangement between an associate and her firm was never reduced to writing may be enforceable.  *Id.* at *7.  Nonetheless, conflicting evidence regarding the existence of a contract ultimately precluded further analysis.  *Id.* at *3.  Just as any other contract case, the *Travelers* court found that there was insufficient evidence to support a finding that a contract existed.  At that juncture, any further legal analysis is terminated.  *Id.* at *7.  Stated otherwise, the *Travelers* contract analysis stopped at the same crossroads as all contract cases: where the claimant fails to prove the existence of a contract, the cause fails, and the court will not extend its analysis further.  Accordingly, contrary to Darken's claim, the *Travelers* case does not stand for the premise that a contract between a firm and its associate binds the client.

In the instant matter, Darken's Notice of Lien fails to offer any evidence that Vinca and his co-relator, Jennifer Sweeney (the "Co-Relators") consented to the alleged internal compensation arrangement within the Cohen firm, or when said arrangement was ever reduced to writing in any form, or, in fact, any corroboration whatsoever to the existence of this alleged arrangement.  Vinca

hired Cohen and anticipated good faith representation orchestrated by Cohen upon the referral of Saady. Unless Darken can prove that Vinca expressly agreed to the terms of this so-called internal compensation arrangement, Darken lacks standing to assert his own charging lien against Vinca. Further, under the statute of frauds, any such unwritten contract self-evidently could not be performed within one (1) year and thus is not enforceable. *See LaRue v. Kalex Const. and Development, Inc.*, 97 So.3d 251, 256 (Fla.3d DCA 2012).

Additionally, the cases cited by Darken in his Notice of Lien hold that any recovery by an associate attorney is directly limited to any recovery of the law firm as a whole. *See Barwick, Dillian & Lambert, P.A. v. Ewing*, 646 So.2d 776 at 779-780 (Fla. 3d DCA 1994). Darken is simply not entitled to his own charging lien absent a representation agreement whereupon Vinca expressly accepted Darken's representation in lieu of other counsel. Former Counsel, with whom Vinca initially contracted, has already asserted its claim in the same pleading. Therefore, whether Darken is entitled to proceeds of a charging lien is wholly irrelevant to the instant matter; it is simply a matter beyond the issues before this Court whether Former Counsel must share any fee amongst itself.

**II.    The work set forth in the Retention Agreement has not been fully performed or completed and, as a result, Former Counsel is not entitled to the full amount.**

Former Counsel—both Darken and Saady-- go to great lengths in the Notice of Lien to claim they "fully performed" under the Retention Agreement. [DE 167 ¶6] There is no dispute that Former Counsel did perform work for the benefit of Vinca pursuant to the Retention Agreement, but of questionable caliber, indeed. Vinca concedes that as a result of Former Counsel's efforts, he (and his Co-Relator Sweeney) were conditionally deemed the "first-to-file"; a significant finding in Vinca's favor. Against this first-to-file finding, however, is the recognition and subsequent opinion by counsel for the United States (the "U.S."), Assistant U.S. Attorney

Richard Nicholson ("Nicholson") of the U.S. Department of Justice (the "DOJ"), that the Complaint filed by Co-Relators Vinca/Sweeney was materially deficient although there was no known rush to be "first to file".  As a result, Nicholson opted, contrary to abundant precedent, to divide the normally indivisible corpus of the first-to-file relators' share (the "Vinca share") with five (5) subsequent filers.  This unique recommendation by Nicholson, to divide the first-to-file relators' share amongst numerous subsequent relators, occurred because the first-to-file complaint prepared by Former Counsel was so significantly compromised in substance that it resulted in significant financial detriment to Co-Relators Vinca/Sweeney: they were apportioned fifty-five (55%) percent of the total relator share, instead of the typical one hundred (100%) percent apportionment granted to first-to-file relators.

On May 22, 2017, Nicholson outlined the DOJ's position as to apportionment of the *qui tam* proceeds among all six of the whistleblower cases (hereinafter referred to as the "Nicholson Letter"), some who filed their complaints years after Co-Relators Vinca/Sweeney.  In footnote 10 of the Nicholson Letter, he expressly justified his rationale in this instance (of dividing what is normally the indivisible corpus) that a first-to-file complaint which is legally deficient should not bar later complaints, an observation subsequently ratified without comment by the Trial Court.

Therefore, a declaration by Former Counsel that they fully performed under the Retention Agreement is simply inaccurate.[3]  They failed Co-Relators Vinca/Sweeney, and to epic proportions.  As the Trial Court noted, while Co-Relators Vinca/Sweeney tardily filed a slew of (other) motions which essentially attacked the subsequent relators' entitlement to the settlement proceeds for reasons other than the first-to-file bar [See DE. 74-78], said motions were untimely

---

[3] This is especially so when, in a separate motion, Saady stated, "It is not disputed that the Federal Case, including the appeals to the Eleventh Circuit Court of Appeals, is still proceeding."  Defendants Saady & Saxe P.A. and Claire Saady's Motion for Stay and Abatement, p. 2 (the "Malpractice Litigation"), *infra*.

and therefore moot.  Such ineffective attempts to rectify the initial malpractice are not the stuff of recompense.  Notably, the Trial Court found it questionable whether Co-Relators Vinca/Sweeney even had standing to attack the subsequent relators' entitlement to the settlement proceeds at a time "*after the Government had settled these claims* other than to request the Trial Court to apply the first-to-file bar."  [DE 131 footnote 4].  Apparently, Former Counsel commenced a frantic *ex post facto* effort to remedy the paucity of detail in its scant Vinca/Sweeny Complaint consisting of a mere eight (8) pages [DE 2] (compare, i.e. the Montecalvo Complaint consisting of one-hundred ninety-three (193) pages including detailed evidence corroborating False Claims Act and Anti-Kickback Statute violations).  Former Counsel undertook this too-late, ineffectual campaign in an effort to avoid the inevitable Trial Court comparison of subsequent, well formulated complaints for the obvious reason that the Vinca/Sweeny Complaint might be subject to challenge as woefully short on both form and substance when Former Counsel failed to adequately allege corroborating evidence pointing to agencies known by their clients to be involved in the fraudulent activities: a side by side comparison to subsequent complaints demonstrates the vulnerabilities evident within Former Counsel's pleading.

Accordingly, this matter was far from concluded, and Former Counsel only acted proactively in a too-little, too- late fashion when it belatedly tried to remedy its original fundamental duties, penultimately to the detriment of Vinca.  When Vinca recognized the abject breach of his Former Counsel's loyalties, he recognized the need for additional legal representation yet to be done on his behalf:  even the Trial Court acknowledged the overwhelming responsibility to rule on the issue of the Co-Relators' share if the Eleventh Circuit disagrees with Trial Court's allocation of the settlement awards, which must be resolved before the Co-Relators' share of that allocation must be reserved.  (*Infra*, p. 12)  Further, in footnote 1 of the Trial Court's February 21,

6

2018 Order (the "Stay Order") [DE 156], it noted that Relators Motencalvo, Medolla, Petty, et. al., and Webb have challenged the Trial Court's proposed division of the relators' share as recommended by the DOJ: it is thus self-evident that the contingent event entitling each relators' counsel to fees has yet to occur, and finding Former Counsel with a proactive and aggressive approach (who was demanding a personal loan from Vinca to be obtained at exorbitant interest rates in order to continue his representation) was an inevitable move of self-preservation.

In the face of the November 20, 2017 Order (the "Apportionment Order"), Former Counsel alleges that "the Retention Agreement specifically excluded work on any appeals [and, as such], the work required by the Retention Agreement has been fully performed."  [DE ¶ 16]  Curiously, upon discovering that Vinca was exploring new representation, Former Counsel then volunteered to continue his representation on all appellate matters adding the conditional term that Vinca must obtain a personal loan to fund Former Counsel for the interim, notwithstanding the terms of the Representation Agreement to the contrary.  Former Counsel even graciously made a referral to a "friendly" funding source.  Declining that opportunity, Vinca sought counsel elsewhere.

In other words, although Vinca must continue with empty pockets to litigate the issue of entitlement to his relator award—which issue of division of the relators' fees is a direct result of his Former Counsel's failures to  adequately plead (i) the breadth of victims known to counsel, and (ii) the depth of the kickback and fraud schemes by filing a shoddy and incomplete complaint— yet somehow Former Counsel takes the position that the Retention Agreement entitles them to fees today.  This is especially gutsy in light of the Trial Court's express finding that Former Counsel's Co-Relators Vinca/Sweeney complaint was so inarticulate that it declined to consider Former Counsel's argument that their Complaint "put the U.S. government on the trail" of the fraudulent scheme, thereby opening the door to five (5) subsequent relators who now share in the recovery

proceeds because both the DOJ and Trial Court deemed the subsequent relators to be more comprehensively forthcoming whistleblowers. [DE 131]  As is well known to Former Counsel, a "Battle Royale" is brewing either by the pending appeal or mediation/settlement to demonstrate entitlement to a portion of the *qui tam* proceeds in light of the other relators' arguments regarding Rule 9(b) entitlements and standing.

Vinca fired Former Counsel when he was actually instructed to borrow money to fund the cost of the remainder of the instant case.  Vinca was instructed by Domenic Massari ("Massari"), an employee of Cohen, to go to Client Legal Funding to borrow money to fund the instant action via an e-mail dated December 15, 2017.  See Exhibit "A" attached hereto.

Massari, and his role, are critical to Vinca's split from Former Counsel.  Massari, a former member of the Florida Bar, was disbarred for fraudulent abuse of client trust funds and dishonesty to the Florida Bar.  However, Massari played a critical role in this case, and was introduced to Vinca as both a "retired attorney," and at mediation as a "consultant" by Former Counsel.

Demanding a loan with an interest rate of over one hundred (100%) percent per annum, Massari's demand was unsupportable under any legal analysis, and this became Vinca's last straw. Clearly, Former Counsel was not operating pursuant to Vinca's best interest.  Accordingly, Vinca sought new counsel after (i) learning his *qui tam* relator's award appeared to have been reduced by nearly half due to a shoddy pleading and ineffectual subsequent remedial measures; (ii) being compelled to borrow money at a rate in excess of one hundred (100%) percent interest rate per annum as a condition of proceeding with litigation; and (iii) being forced by Former Counsel to deal directly and regularly with Massari whom he eventually learned was not a "retired" lawyer but, instead, is a disbarred lawyer for fraudulent acts with trust funds—a justifiable and a reasonable act of self-preservation.

Despite their protests to the contrary, Former Counsel has reneged on the pleaded claim that they have earned their fees.  They conspired to use unlawful counsel.  They attempted to lure Vinca to remain a client of this unholy concern.  Specifically, on January 10, 2018, while still employed as an associate of Cohen,[4] and in order to retain Vinca as a client, Darken offered Vinca a revised fee agreement whereby he and Cohen would not reduce Former Counsel's forty (40%) percent contingency fee, but did agree to waive any additional fee of the underlying lawsuit and undertake the appeal.  See Exhibit "B" attached herewith.

Former Counsel's rationale to declare their rights fully vested are obvious—they want to overlook that the contingent event necessary for a claim in *quantum meruit*— a final order deciding the division and distribution of the relators' awards—had not yet occurred.  Until a final judgment on the issue of division and distribution of the relators' awards occurs, work on the case *sui juris* has not been "fully performed" because (i) Vinca faced ongoing significant litigation as the matter of relator shares has been challenged and remains very much at issue; and (ii) Former Counsel risked their right to recovery of any fees whatsoever by using a disbarred attorney (Massari) in an active role as counsel in this action, which having been discovered, would potentially disqualify all Former Counsel from receiving any fees.  Thus, Former Counsel's claim is nothing more than a veiled attempt to recover fees for incomplete and unethical work.  Stated otherwise, Former Counsel's "generous" offer to litigate the appeal is not so generous when, in the cold light of day, it is self-evident that Former Counsel must agree to do the "additional work" associated with an appeal—and maintain a cone of confidentiality around its unscrupulous behavior-- in order to recover their fees.  Based upon Former Counsel's historic representation, Vinca declined this

---

[4] Candidly, we do not know if Darken, as an associate, was speaking for the Cohen firm when he made the offer.

"generous" offer with good reason and thus, at most, should not be liable for the dubious legal services he received.

Significantly, while Former Counsel insists in their Notice of Lien and other pleadings that "the contingency has been met" [DE 167 p. 13] and "the work has been fully performed" [DE 167, p. 16], Former Counsel has now conveniently taken an inconsistent position on this assertion in a separate state court action styled *Brian Vinca vs. Barry A. Cohen, Barry A. Cohen,,P.A., Cohen, Foster & Romine, LLC, The Barry A. Cohen Legal Team, Claire Saady, Saady & Saxe, P.A.; Kevin Darken; The Kevin J. Darken Law Group, LLC*, Case No.18-CA-0079365, pending in the Thirteenth Judicial Circuit of Hillsborough County, Florida (the "Malpractice Litigation").  In the Malpractice Litigation, Former counsel claims in their recently filed motions for a stay and abatement (the "Abatement Motions") that the action *sui juris* is not complete in avoidance of the malpractice claim filed by Vinca.  Specifically, the Malpractice Litigation defendants a/k/a Former Counsel explicitly seek to stop the Malpractice Litigation from proceeding upon the affirmative representation that "It is not disputed that the Federal Case is still proceeding." (Abatement Motions ¶5).  The Malpractice Litigation defendants a/k/a Former Counsel go on to reiterate, "In other words, the allegations in Plaintiff's own complaint confirm that the underlying Federal Case is not "final" (Abatement Motions ¶6).  Former Counsel simply cannot assert contradictory positions in separate actions in order to use the law as both a sword and a shield to demand a full contingency fee but avoid suit for negligence in violation of the principles of judicial estoppel.

**III.**    **Because the contingent event has not occurred, Former Counsel is not entitled to the full amount set forth in the Retention Agreement.**

Former Counsel asserts that "the contingency in the Retention Agreement occurred no later than January 2018, long before Vinca's termination of Former Counsel on March 21, 2018."  [DE 167 ¶13]  In support of this claim, Former Counsel quotes a portion of the Retention Agreement

that states "it is agreed that payment of the Attorneys' fees shall be in a lump sum payable at the time of the settlement unless otherwise agreed by [Vinca] and [Former Counsel] in writing." As such, Former Counsel now asks this Court to find that the contingent event occurred when Vinca agreed to the relator share awards proposed by the DOJ.

Their logic is fatally flawed. Settlement clearly had not occurred. Tellingly, Former Counsel fails to cite to a single case in support of their claim which can be relatable to the instant matter. If, as Former Counsel claims, the contingent event had occurred, with the settlement being final, Vinca would be receiving his relator share without additional litigation or dispute, and there would simply be nothing remaining to litigate. However, such are not the facts of the instant action. Because a *qui tam* case is a unique animal and not a typical lawsuit, equity and justice must fill the gaps where precedent is lacking. Accordingly, in the instant matter, where the federal government elected to intervene and ultimately settle the case with the Shire defendant, and neither Former Counsel, Vinca, nor any other relator had any control whatsoever of the settlement, no contingent event between the parties has occurred. Indeed, the Trial Court recognized this fact in its Apportionment Order stating, in pertinent part, that "no Relator can dispute that the Government and Shire are the only parties with actual knowledge of the factors that led to the Shire settlement." [DE 131 p.7] The apparent settlement upon which Former Counsel relies--which occurred between the U.S. government and the Shire defendant (parties who have no stake in the outcome of this issue)—could never be the contingent event upon which *qui tam* counsel can rely to claim a reward, since a federal government settlement is not in the control of relators' counsel.

We know this to be true, as the government has the right to "veto" a voluntary settlement in *qui tam* cases, even if the government declined to intervene. *United States ex rel. Michaels v. Agape Senior Community, Inc*., 848 F.3d 330 (4th Cir. 2017) (Holding that the government has

absolute veto power over voluntary settlements in False Claims Act *qui tam* actions.); *Searcy v. Philips Elec. N. Am. Corp.*, 117 F.3d 154 (5th Cir.1997).  As such, it is readily apparent that, unlike in traditional litigation between two parties, the government has total control of the matter, including settlement.  As Former Counsel implicitly concedes, this settlement is not the contingent event for purposes of determining its entitlement to the full contingency.

Once the matter was settled between the U.S. government and Shire, litigation amongst the identified relators commenced, with each relator seeking to recover as much as possible from the settlement.  The Nicholson Letter apportioned the *qui tam* proceeds of the settlement as follows:

    a.  Vinca and Sweeney – 55.155%
    b.  Mark Harvey - 40.314%
    c.  Joseph Medolla – 3.5299%
    d.  Daniel Petty, Christopher Bell, Kyle Richardson and Tara Denney – 0.4%
    e.  Heather Webb – 0.35%
    f.  Antonio S. Montecalvo – 0.25%

On November 20, 2017, the Trial Court analyzed and adopted the Nicholson Letter, apportioning the settlement amounts between the relators in the manner set forth by the Nicholson Letter [DE 131].  Former Counsel contends that, because Vinca agreed to his relator share proposed by the Nicholson Letter, that a contingent event entitling counsel to its fee has occurred. Former Counsel's logic breaks down completely at this point, as it ignores the express findings of the Trial Court.

When the Apportionment Order (which was based upon the Nicholson Letter) was appealed by Relator Montecalvo on February 2, 2018 [DE 148], the Trial Court, recognizing that the case had not reached its conclusion (and thus the contingent event had not occurred), issued an order on February 21, 2018, staying this matter along with five (5) other lawsuits brought on behalf of the other named relators.  [DE 156]  The Trial Court specifically noted in the Stay Order that:

"It would be an overwhelming burden on the Court's resources to rule on the issue of the Relator's share if the Eleventh Circuit disagrees with the Court's allocation of the Shire settlement, **which naturally must be resolved before the Relator's share of that allocation can be determined**." (Emphasis added).

\*            \*            \*            \*            \*

"[T]he Eleventh Circuit's opinion on the Court's allocation of the federal component would be meaningful to shed guidance on the method the Court should use to allocate the state component. The Court's November 20, 2017 Order referenced the fact that the Eleventh Circuit has not specifically addressed many of the legal issues the Court was faced with when it allocated the federal component of the Shire Settlement among six different cases. These legal uncertainties equally apply to the proper allocation of the state component."
[DE 156]

This Court has already recognized that the matter is far from concluded and, as such, the contingent event has not occurred for purposes of the Retention Agreement between Vinca and Former Counsel. To put it simply, there is absolutely no certainty as to whether the Eleventh Circuit will adopt the Trial Court's Apportionment Order, or whether it will revise the settlement allocation method. Hypothetically, if the Eleventh Circuit revises the allocation method wherein Co-Relators Vinca/Sweeney were to receive five (5%) percent of the relator share, then Former Counsel's claim today for forty (40%) percent of the relator share "awarded" by the Apportionment Order, would far exceed the amount actually received by either Co-Relator, which defies both law and equity. From this hypothetical we can see that the contingent event simply has not and will not occur until the Eleventh Circuit (and potentially the U.S. Supreme Court) issues its final decision. As such, Former Counsel is not entitled to receive the full contingency amount claimed because the contingent event has not yet occurred.

## IV.   This Court must determine whether Former Counsel's alleged malpractice warrants a forfeiture of fees.

Vinca claims that Former Counsel engaged in a series of bad acts and malpractices which caused significant damages in the form of his lost relator share.  Former Counsel cites to *Zaklama v. Mount Sinai Medical Center*, 906 F.2d 650 (11th Cir. 1990) for the proposition that Vinca's potential malpractice or negligence claims are irrelevant to the validity of Former Counsel's Notice of Lien.  In *Zaklama*, in contrast to the instant matter, the contingent event had occurred, thus entitling *Zaklama's* prior counsel to the contingency fee.  Unfortunately, and tellingly, Former Counsel only provided this Court with a partial, incomplete, and therefore misleading quote from the actual case.  Footnote 5 of the Notice of Lien provides the following citation to *Zaklama*:

> "[w]hether [Vinca] has grounds for a malpractice or negligence case in state court is irrelevant" to the validity of this charging lien and to the [Prior Counsel's] entitlement to be paid their full contingent fee under the Retention Agreement.

The *Zaklama* court did not arrive at that specific conclusion.  Instead, the court reached the following conclusion:

> "[w]hether [Vinca] has grounds for a malpractice or negligence case in state court is irrelevant **to this appeal.**"  (Emphasis added)

The *Zaklama* decision did not state that a malpractice or negligence case is irrelevant to the validity of a charging lien; rather, with distinguishable facts, that court found it was simply irrelevant to that specific appeal because the court had ruled that the contingent event had occurred.  In contrast, any grounds which Vinca may have for malpractice or negligence against Former Counsel in the instant matter are wholly relevant to the amount which Vinca, as the first-to-file Relator, should have recovered with proper representation, and Former Counsel is liable from the proceeds of same.

In *Exact Software v. Infocon Systems, Inc.*, 2011 WL 2490594 (W.D. Ohio June 22, 2011), the court held that, despite the prior counsel's assertions to the contrary:

> "breaches of fiduciary duty and unethical conduct may reduce the value of such services. **A lawyer's improper conduct can reduce or eliminate the fee that the lawyer may reasonably charge, and 'a tribunal will also consider misconduct more broadly, as evidence of the lawyer's lack of competence and loyalty, and hence the value of the value of the lawyer's services.'** Restate.3d of the Law Governing Lawyers, § 37; see also 16 Causes of Action 85 (2007) ('A client seeking to mitigate liability for the payment of attorneys' fees on a quantum meruit basis may interpose affirmative defenses to the action to recover fees, including . . . malpractice or misfeasance committed by the attorney in representing the client.'). *Exact Software* at *6 (emphasis added).

Much like Former Counsel in the instant matter, prior counsel in *Exact Software* cited to case law holding that mere misconduct is insufficient to warrant forfeiture of an attorney's fee. *Id.* at *7. The *Exact Software* court rejected this argument, holding that the "primary question is not whether [the prior counsel'] misconduct merits forfeiture, but rather the reasonable value of the service [the prior counsel] provided." *Id.* The Court plainly held that the "**misconduct allegations are relevant to determining the quality of [the prior counsel's] services. Those allegations may lead to a reduction in an award or even provide an affirmative defense to [the quantum meruit] claims**." *Id.* (Emphasis added)

In *Searcy, Denney, Scarola, Barnhart & Shipley, P.A. v. Scheller*, 629 So.2d 947 (Fla. 4th DCA 1993), the Fourth District Court of Appeals was faced with similar dispute. In *Scheller*, the relevant parties entered in to a contingency fee agreement that provided for forty (40%) percent of any recovery to the trial lawyers. *Id.* at 948. Five (5) years later, a modified contingency fee agreement was executed, which reduced the lawyer's fee to forty (40%) percent on the first $1 million, thirty (30%) percent on the second, and twenty (20%) percent on anything in excess of

the $2 million.[5]  *Id.*  During post-appeal settlement discussions, Scheller discharged his trial attorney before the supreme court had accepted jurisdiction or entered a stay, contending that his attorney had attempted to extort a new and unreasonable fee agreement to pad his share of the recovery.  Not surprisingly, the prior attorney claimed that Scheller was trying to avoid paying the agreed upon fee, which would be substantial on a verdict of $26 million.  *Id.*  The trial court found that the trial attorney breached the fee agreement and had thus forfeited his entitlement to a fee. The appellate court reversed the decision only as to the appropriate remedy.  *Id.*

> "**A lawyer engaging in clear serious violation of duty to a client may forfeit some or all of the lawyer's compensation for the matter**.  In determining whether and to what extent forfeiture is appropriate, relevant considerations include the extent of the violation, its willfulness, any threatened or actual harm to the client, and the adequacy of other remedies."  *Scheller* at 952 (citing Restatement of the Law Governing Lawyers (Tentative Draft No. 4 April 1991) § 49) (emphasis added).

The *Scheller* court further noted that "One of the justifications for forfeiture is that it is sometimes difficult to ascertain the harm a lawyer's misconduct may have caused.  The harm may be intangible, such as the client's loss of trust in the lawyer's loyalty and good faith."  *Id.*  As such "[a]n extraordinary remedy like fee forfeiture should be considered only when an ordinary remedy like offsetting damages is plainly inadequate."  *Id.* at 953.  "If the client's damages exceed the *quantum meruit* fee, then that should end the matter.  The fee would not then be forfeited but rather offset against the attorney's obligation to the client."  *Id.* at 955.

Related to the instant action, Vinca initiated the Malpractice Litigation by filing a nine (9) count complaint (the "Malpractice Complaint") against Former Counsel.  Given that the

---

[5] The modified agreement appears to have been entered into for purposes of conforming with the new Florida Bar rules relating to contingency fee agreements.

Malpractice Litigation has only recently been filed, no discovery has been conducted to date that explores the full breadth of the malpractice committed by Former Counsel.

Despite this present limitation, it is readily apparent that Former Counsel committed malpractice and malfeasance by employing the services of Massari, throughout the underlying litigation in violation of Florida Bar Rule 3-6.1(d)(1).  Massari had regular, direct contact with Co-Relators Vinca/Sweeney and was actively involved in all aspects of running the Cohen practice, including giving legal counsel before and during mediation, and in attempts to settle this matter with the subsequent-filed relators.  Massari's activities were not only facilitated by Former Counsel, who described Massari's role in the underlying action at various times as "retired counsel," "consultant," and/or "paralegal," but using Massari was specifically undertaken with fraudulent intent at Former Counsel's behest.  Promoting Massari is doubly alarming upon examining his background since Massari was disbarred in 2002 for misconduct including fraudulently obtaining client's settlement funds through the forging of signatures, misappropriating those funds and committing fraud when attempting to conceal the misconduct. *See The Florida Bar v. Massari*, 832 So.2d 701 (Fla. 2002).  This fact was well known to Former Counsel, as the Supreme Court opinion regarding Massari's bad acts is both published and widely distributed within the Tampa Bay legal community.  Alternatively, if Former Counsel claims that they had no knowledge of Massari's disbarment, then Former Counsel committed both negligence and malpractice by not conducting an appropriate background check that would have revealed his disbarment.[6]

---

[6] A quick search on the Florida Bar's website would reveal the disbarment.

Furthermore, Former Counsel actually accommodates Vinca's claim by admitting to additional malpractice in the Notice of Lien.  In Footnote 1, Former Counsel acknowledges the following:

> "Relator Vinca had knowledge of and evidence showing only fraud on the Medicare program and not on other federal programs such as the Tricare, Medicaid and Veterans Administration Programs. Accordingly, as required by Fed. R. Civ. P. 11, the Vinca/Sweeney complaint alleged only fraud on the Medicare program.  However, all attorneys representing Mr. Vinca argued in Vinca's first to file motion and responses to motions by other relators that his Complaint and Amended Complaint entitled Vinca to all FCA recoveries in all federal government programs.  Prior to this Court's ruling on Vinca's first to file Motion, Vinca elected to and did voluntarily settle his first to file dispute with Relator Harvey."

First and foremost, a cursory review of the documents provided to Former Counsel by Vinca clearly provided Former Counsel with adequate information to sufficiently allege fraud against the Tricare, Medicaid, and Veterans Administration programs.  The documents contain proof of the fraudulent scheme against all three programs.  Even if Former Counsel missed this glaring evidence, acting as counsel owing a fiduciary relationship to Vinca, and somehow did not recognize that there was sufficient evidence to allege the fraudulent scheme against each program, a basic interview with their clients would have revealed the extent of the scheme.  Former Counsel never did so, despite agreeing in the Retention Agreement to present Vinca's "claims to the state and federal governments and the filing of necessary qui tam actions on [Vinca's] behalf."

After realizing their costly error, which enabled another relator to recover over forty (40%) percent for information which Co-Relators Vinca/Sweeney had provided Former Counsel, Former Counsel then attempted to rectify their negligence by framing an argument to this Court, in essence, that they had "put the government on the trail" for the claims brought forth by Relator Groups 2 through 6 set forth above.  Former Counsel argued that the first-to-file complaint did not

need to allege with specificity the information related to the Tricare, Medicaid, and Veterans Administration programs because they "put the government on the trail."  [DE 118]  To put it simply, Former Counsel *admitted* that they failed to plead the claims against Tricare, Medicaid, and the Veterans Administration programs with specificity as required per Rule 9(b), but nonetheless believe that this Court should still award the entirety of the relators' fees to Co-Relators Vinca/ Sweeney because they did provide the evidence, despite Former Counsel's failure to plead the claims.  This Court rejected their argument, adopting the rationale set forth in the Nicholson Letter.  Given the rationale set forth in both the Nicholson Letter and the Apportionment Order [DE 131], Former Counsel's abject failure to allege sufficient information related to the Tricare, Medicaid, and Veterans Administration programs, was the direct cause of the loss to Co-Relators Vinca/Sweeney of that portion of award proceeds that were instead allocated to Relator Groups 2 through 6.

Pursuant to *Exact Software* and *Scheller*, this Court should consider the misconduct allegations set forth in the Malpractice Complaint (and discussed above) in order to determine whether Former Counsel should forfeit their attorneys' fees or suffer a fee reduction based upon their malpractice and malfeasance accordingly.

Finally, Former Counsel attempted to borrow money from Vinca to complete litigation and used a lack of money as leverage to inextricably intertwine Vinca with a usurious loan from Client Legal Funding to fund the remaining litigation.  This loan was researched by Vinca under protest and without alternative, and Former Counsel failed to disclose an apparent cozy relationship between lender and counsel.  In fact, upon hiring new counsel, Vinca was quickly introduced to multiple, ethical options to eradicate the Client Legal Funding debt and move forward with his own expenses not related to litigation.  Such unprincipled coercion by Former Counsel mid-

litigation and upon facing a challenge to the relator fee awards, alone, is sufficient to require forfeiture of Former Counsel's attorneys' fees in this action.

**V.**     **Any forfeiture or reduction against Former Counsel for attorneys' fees awarded arising from their negligence to the benefit of Relator Vinca would also be applicable against attorneys' fees for Co-Relator Sweeney, as well.  Any attorneys' fees reduction must be applied in equal proportion to both Co-Relators Vinca and Sweeney which thereby increases the First Co-Relators' *res* in its entirety.**

Former Counsel wishes for this Court to view the First Co-Relators' settlement *res* as being two (2) separate and distinct *res'* – one for Vinca and one for Sweeney.  However, this is not the case.  There is no authority for the presumption that multiple *res* be awarded which arise from the Vinca/Sweeney Complaint.  In fact, Former Counsel consistently and uniformly considered the Vinca/Sweeney Complaint as one (1) complaint throughout the tenure of this litigation, through appeal, and ultimately, through settlement.  Indeed, any final judgment would necessarily be limited to one (1) *res* as consistently pleaded until subsequent counsel interceded when Vinca discovered that his legal team intentionally used unlicensed counsel throughout this action, confirming Vinca's original suspicion that his representation, from Complaint going forward, comprised malpractice.

In the event that this Court deems Former Counsel's alleged malpractice as warranting forfeiture or a reduction in Former Counsel's attorneys' fees for Vinca, this same forfeiture and/or reduction must also be applied to his Co-Relator Sweeney's award of the *res*.  Even if she does not complain, her counsel cannot benefit from its conspiracy to commit fraudulent representation.  It would be unsuitable for this Court to apply a forfeiture/reduction to only one relator, when the alleged malpractice permeates the entire case and poisons Former Counsel's right to any *res* at issue arising from the Vinca/Sweeney Complaint.

Any amounts that are forfeited and/or reduced by this Court should be placed back in the *res* to be divided equally between Co-Relators Vinca and Sweeney.  Both sides should benefit from a disgorgement of wrongful gains by Former Counsel.  Alternatively, an equal forfeiture and/or reduction must be awarded in favor of Co-Relator Sweeney[7].

If any attorneys' fees are awarded to Former Counsel, this Court must retain these amounts in the Court's registry pending the resolution of the Florida Bar's investigation into this matter.  The attorney investigator for the Florida Bar in this matter is Troy Lovell, Esq.  Mr. Lovell has advised the undersigned that he is willing to elucidate for the Court the Bar's position and has authorized the undersigned counsel to provide this Court with his contact information should the Court wish to speak with him directly.[8]

## **CONCLUSION**

Any alleged internal compensation arrangement between Darken and Cohen is wholly irrelevant to the issues concerning Former Counsel's Notice of Lien.  Any alleged internal compensation arrangement between Cohen and Massari is prejudicial to this case.  It cannot be disputed in good faith that Former Counsel did not "fully perform" pursuant to the terms of the Retention Agreement and the contingent event has not yet occurred, a fact previously recognized by this Court.  Finally, this Court should consider that Former Counsel should disgorge their attorneys' fees or otherwise suffer a reduction in fees as a result of the alleged misconduct set forth in the Malpractice Complaint for which current counsel has aggressively attempted to remedy to the extent possible.  For the foregoing reasons, Former Counsel is not entitled to the entire forty

---

[7] Under this latter scenario, Co-Relator Vinca and his undersigned counsel assert a claim pursuant to *quantum meruit* as Co-Relator Sweeney would be accepting and receiving a benefit that is being conferred upon her by Co-Relator Vinca, and that the circumstances are such that it would be inequitable for her to retain the benefit without paying fair value for said efforts undertaken on her behalf and the benefit thereto..

[8] Mr. Lovell may be reached directly at (813) 875-9821.

(40%) percent claimed in the Notice of Lien.  Former Counsel may be entitled to a claim in *quantum meruit* for the limited work which it performed in a demonstrably ethical fashion on behalf of Co-Relators Vinca/Sweeney prior to Vinca's termination of Former Counsel.  However, this amount should also be reduced as this Court deems appropriate by either forfeiture or otherwise pursuant to *Scheller* and *Exact Software* for Former Counsel's misconduct and malfeasance.  Additionally, any forfeiture and/or reduction in attorneys' fees awarded to Former Counsel for Co-Relator Vinca must also equally be applied to attorneys' fees for Co-Relator Sweeney, with the reduced amounts being divided equally between Co-Relators Vinca and Sweeney.

*/s/ Noel P. McDonell*
Noel P. McDonell, Esquire
Fla Bar No. 0899232
Bryen N. Hill, Esquire
Fla. Bar No.: 0095993
MACFARLANE FERGUSON & MCMULLEN
Post Office Box 1531, Tampa, Florida 33601
Telephone: (813) 273-4200
Facsimile: (813) 273-4396
Attorneys for Relator Brian Vinca

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been furnished

on this 27th day of November, 2018, via the U.S. District Court, Middle District Court of Florida's

CM/ECF Portal to the following:

Christopher P. Tuite
US Attorney's Office - FLM
400 N Tampa St., Suite 3200
Tampa, FL 33602-4798

Lacy R. Harwell, Jr.
US Attorney's Office - FLM
400 N Tampa St., Suite 3200
Tampa, FL 33602-4798

Richard S. Nicholson
U.S. Department of Justice, Civil Division
Ben Franklin Station, P.O. Box 261
Washington, DC 20044

Sean P. Keefe
US Attorney's Office - FLM
400 N Tampa St., Suite 3200
Tampa, FL 33602-4798

Barry A. Cohen
The Barry A. Cohen Legal Team
201 E Kennedy Blvd Ste 1950
Tampa, FL 33602-5865

Kevin J. Darken
The Barry A. Cohen Legal Team
201 E Kennedy Blvd Ste 1950
Tampa, FL 33602-5865

Michael C. Addison
Addison Law Office, P.A.
1304 Alicia Ave
Tampa, FL 33604-6406

Germain Law Group, PA
Suite K
3412 W Bay to Bay Blvd
Tampa, FL 33629

Ray M. Thompson
H Brody, PA
3712 S Lockwood Ridge Rd
Sarasota, FL 34239

Trevor W. Howell
Howell Law Firm
701 Broadway Ste 401, Box 17
Nashville, TN 37203

Silvija A. Strikis
Kellogg Hansen Todd Figel & Frederick, PLLC
1615 M St NW Ste 400
Washington, DC 20036-3215

Victor Stephen Cohen
Bajo Cuva Cohen Turkel, PA
100 N Tampa St Ste 1900
Tampa, FL 33602-5853

Jason Kyle Whittemore
Wagner, Vaughan & McLaughlin, PA
601 Bayshore Blvd., Suite 910
Tampa, FL 33606

Jonathan K. Tycko
Tycko & Zavareel, LLP
1828 L Street N.W., Suite 1000
Washington, DC 20036

*/s/ Noel P. McDonell*
**Attorney**

23