UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA
*ex rel*. BRIAN VINCA and
JENNIFER STAUP SWEENEY,

        Plaintiffs,

v.                                       Case No. 8:11-cv-176-JSM-AEP

ADVANCED BIOHEALING, INC.,

        Defendant.

_____/

## **REPORT AND RECOMMENDATION**

This cause comes before the Court on the charging liens of Barry A. Cohen, P.A. ("Cohen Firm") and Saady & Saxe, P.A. ("Saady Firm") (collectively, "Former Counsel") asserted against their former client, Brian Vinca ("Vinca") (*see* Doc. 167).[1] The undersigned conducted an evidentiary hearing on the matter. Upon the conclusion of the evidentiary hearing, the Cohen Firm and Saady Firm each filed Post-Hearing Briefs in support of the charging liens (Docs. 488 & 489), and Vinca filed a Closing Brief in opposition to Former Counsel's charging liens (Doc. 487). For the reasons set forth below, it is recommended that Former Counsel's charging liens be recognized and enforced to the extent that Former Counsel be allotted a *quantum meruit* award in the amount of $6,128,500.

_____

[1] Kevin J. Darken, Esq. also asserted a charging lien but, as discussed in more detail below, Mr. Darken was not a signatory in his individual capacity to the legal representation contract at issue.

I.    **Background**

Vinca, along with Jennifer Staup Sweeney ("Sweeney"), through Former Counsel, initiated this *qui tam* action on January 26, 2011, as co-relators against Advanced Biohealing Inc., n/k/a Shire Regenerative Medicine, Inc.[2] ("Advanced Biohealing"), for violations of the False Claims Act ("FCA"), 31 U.S.C. §3729 *et seq*, based upon allegations of excessive and fraudulent billing by Advanced Biohealing to Medicare (the "Complaint") (Doc. 2), which they subsequently amended (the "Vinca Complaint") (Doc. 37). In the Vinca Complaint, Vinca additionally asserted a claim for unlawful retaliatory discharge against Vinca in Count II ("Vinca Retaliation Claim") (Doc. 37). Specifically, Vinca and Sweeney filed the *qui tam* action against Advanced Biohealing, raising several claims on behalf of the United States under the FCA and a retaliation claim pursuant to 31 U.S.C. § 3730(h) (Doc. 37, ¶¶25-38). According the of Vinca Complaint, Vinca was employed by Advanced Biohealing as a Sales Representative in the Tampa, Florida region from July 2008 to January 2011, and Sweeney worked as a Reimbursement Specialist at Advanced Biohealing beginning in January 2009 (Doc. 37, ¶¶5-6). Further, the Vinca Complaint alleges that Advanced Biohealing caused private physicians to submit false claims to the Medicare program, in violation of the Anti-

---

[2] In 2011, Advanced Biohealing Inc. entered into a merger agreement with and became a wholly owned subsidiary of Shire Pharmaceuticals, Inc., which retained Advanced Biohealing Inc.' s liability to the United States under the False Claims Act, and changed its name to Shire Regenerative Medicine, Inc. (Doc. 37, ¶¶10-16). For ease of reference, the name "Advanced Biohealing" will be used, as opposed to distinguishing between Advanced Biohealing, Inc. and Shire Pharmaceuticals, Inc. or Shire Regenerative Medicine, Inc.

Kickback Statute, by providing illegal remuneration to physicians to induce them and their staff to purchase and use Dermagraft, an artificial skin tissue product intended to treat diabetic foot ulcers, on Medicare patients (Doc. 37, ¶¶7-9, 18-30). This caused physicians to present unlawful kickback-tainted false claims to Medicare (Doc. 37, ¶26-28).

The instant action was not the sole FCA *qui tam* case filed against Advanced Biohealing. On May 13, 2011, Mark Harvey ("Harvey") filed the second *qui tam* complaint (the "Harvey Complaint"), in which Harvey alleged that he was employed by Advanced Biohealing as a Sales Representative, assigned to the Veterans Affairs ("VA") Division, from November 2008 until late 2009, and, in that capacity, Harvey traveled across the country to market Dermagraft to VA hospitals and outpatient clinics (Doc. 131, at 3). Harvey alleged that Advanced Biohealing routinely and systematically violated the FCA by providing remuneration to VA physicians, nurses, and other personnel to induce them to use Dermagraft (hereinafter referred as "VA claims") (Doc. 131, at 3). The allegations in the Harvey Complaint indicated that the VA-specific Sales Representatives operated separate and apart from the salesforce that sold Dermagraft to medical providers outside of the VA system, who may have treated Medicare or Medicaid beneficiaries (Doc. 131, at 3).

On March 15, 2012, Joseph Medolla ("Medolla") filed the third *qui tam* complaint against Advanced Biohealing (the "Medolla Complaint"), in which he alleged that Advanced Biohealing knowingly violated the FCA by providing

kickbacks to physicians, wound care centers, hospitals, and their staffs, to induce them to purchase Dermagraft for use on Medicare, Medicaid, TRICARE, and the VA patients in the treatment of diabetic foot ulcers, in violation of the Anti-Kickback Statute (Doc. 131, at 3-4). Subsequently, on November 21, 2012, Daniel Petty, Christopher Bell, Kyle Richardson, and Tara Denney filed the fourth *qui tam* complaint (the "Petty Complaint"), alleging, amongst other violations, FCA violations related to a nationwide scheme of promoting Dermagraft for various off-label uses, which caused physicians, hospitals, and healthcare providers to present false claims (Doc. 131, at 4). Thereafter, on April 19, 2013, Heather Webb ("Webb") filed the fifth *qui tam* complaint (the "Webb Complaint"), which alleged violations of the FCA related to unlawful kickbacks, off-label uses not approved by the FDA, and false reporting of the national average unit sales price of Dermagraft to Medicare, which ultimately caused Medicare to set and pay artificially high reimbursement for Dermagraft claims (Doc. 131, at 4). Last, on February 14, 2014, Antonio Montecalvo ("Montecalvo") filed the sixth *qui tam* complaint (the "Montecalvo Complaint"), which asserted violations of the FCA for providing unlawful kickbacks to physicians and other healthcare providers; misleading marketing and selling of Dermagraft for non-approved off-label uses; improper coding claims to Medicare and Medicaid, which resulted in false, inflated claims; and falsely reporting average unit sales prices of Dermagraft (Doc. 131, at 4).

On January 3, 2017, the United States sought to intervene in the instant action for purposes of settlement (Doc. 66). Given the other pending *qui tam* cases,

on June 13, 2017, through Former Counsel, Vinca and Sweeny filed a Motion to Consolidate Cases, seeking the consolidation of all six FCA *qui tam* cases filed against Advanced Biohealing (Doc. 68). The district judge granted the request to consolidate and accepted the United States' proposed allocation of the settlement proceeds amongst the six relator actions, such that settlement proceeds were distributed as follows: 55.155% for the Vinca Complaint; 40.314% for the Harvey Complaint; 3.5299% for the Medolla Complaint; 0.4% for the Petty Complaint; 0.35% for the Webb Complaint; and 0.25% for the Montecalvo Complaint (Doc. 131). Subsequently, the United States sought dismissal pursuant to a settlement (Doc. 137). Upon consideration, the district judge entered an Order dismissing all claims against Advanced Biohealing (Doc. 140).

On February 2, 2018, however, Montecalvo submitted a Notice of Appeal challenging the consolidation of the cases and the disbursement of the settlement funds (Doc. 148). Other appeals soon followed (Docs. 153, 157 & 158). Given the pending appeals, the district judge stayed the case as to all remaining issues until resolution of the appeals (Doc. 156). Notably, about five weeks later, on March 28, 2019, Vinca submitted a Motion for Substitution of Counsel, by which he requested that Former Counsel be removed and that Attorneys Noel P. McDonell and Bryen N. Hill and the law firm of Macfarlane, Ferguson & McMullen (collectively, "Current Counsel") be substituted as counsel of record (Doc. 161). The district judge granted Vinca's request and removed Former Counsel from the case, substituting Current Counsel as Vinca's counsel of record (Doc. 162). Following the

substitution, on April 10, 2018, the United States moved for a limited lift of the stay to deposit the settlement funds, in the sum of $86,380,315.48, within the Court registry (Doc. 163). The district judge then lifted the stay and accepted the settlement funds into the Court's registry pending a final determination as to the disbursement of the funds amongst the six *qui tam* cases (Doc. 164). Soon thereafter, on May 15, 2018, Former Counsel filed the instant disputed charging liens (Doc. 167).

Nearly a year later, on February 19, 2019, the district judge granted the parties' joint request for mediation by a magistrate judge (Doc. 181). Mediation began in March 2019 and continued into April 2019 (Docs. 183, 191, 204). On April 23, 2019, the parties entered into an agreement known as the "Settlement Agreement Concerning Relators' Shares" (the "Final Settlement Agreement") in which the parties resolved all disputes concerning the allocation of the proceeds of the settlement reached between the DOJ and Advanced Biohealing (the "Advanced Biohealing Settlement") and the percentage of allocation to be awarded to each of the relators in the six *qui tam* actions. (Docs. 204 & 227). Under the terms of the Final Settlement Agreement, the parties moved to dismiss their appeals in the United States Court of Appeals for the Eleventh Circuit (the "Eleventh Circuit") and agreed that no further appeals concerning the allocation of the six relators' shares would be pursued (Doc. 227). Given the Final Settlement Agreement, on May 17, 2019, the parties sought a release of the funds maintained in the Court registry (Doc. 227), which the district judge granted a few days later, directing that

the funds be distributed pursuant to the terms of the Final Settlement Agreement and the parties' agreed allocation (Doc. 227, at 2-3). On May 24, 2019, the funds were disbursed as previously ordered (Doc. 239). Significantly, a total share of the settlement proceeds was allotted to Vinca in the amount of $17,875,000, with $7,150,000 (40% of Vinca's total share) retained in the Court's registry pending the resolution of Former Counsel's charging liens, and the remaining $10,725,000 was disbursed to Vinca through Current Counsel (*see* Doc. 229).

Upon the completion of discovery related to Former Counsel's charging liens,[3] beginning on February 23, 2021, the undersigned conducted a five-day evidentiary hearing, during which Kevin J. Darken ("Darken"), Claire Saady ("Saady"), and Vinca were called as witnesses to testify (*see* Docs. 456, 460, 464, 470, & 479). Upon the conclusion of the evidentiary hearing, the parties submitted their respective post-hearing briefs (Docs. 487, 488, & 489). The core issue involves what amount of attorneys' fees, if any, Former Counsel should be granted as a *quantum meruit* award from the $7,150,000.00 maintained in the Court's registry.

## II.   Statement of Facts

Based on the presentations during the evidentiary hearing and on the overall record, the undersigned makes the following findings of fact. In the fall of 2010, Vinca consulted with Saady to seek advice about pursuing a wrongful termination

---

[3] Notably, discovery on Former Counsel's charging liens was initially stalled when a Receiver was appointed to represent the interests of the Cohen Firm on May 24, 2019 (Doc. 234-1) but then progressed when the Receiver was later removed on August 14, 2020 (Doc. 355-1).

case against Advanced Biohealing. During the consultation, Vinca detailed for Saady allegations about a kickback scheme at Advance Biohealing, in which he and other Advanced Biohealing employees were paying kickbacks to doctors and providers. Saady knew that Barry A. Cohen ("Cohen") and Darken of the Cohen Firm were experienced *qui tam* lawyers and told Vinca that she could approach them about his allegations to ascertain if they would be interested in pursuing the matter. Vinca agreed and requested that Saady set up a meeting with the Cohen Firm. Prior to his initial meeting with Saady, Vinca previously made statements to agents of the Federal Bureau of Investigation ("FBI") about the Advanced Biohealing kickback scheme and, additionally, called a government hotline and provided a tip about the alleged kickback scheme.

Sometime in October or November of 2011, Vinca and Saady met with Darken to discuss whether the Cohen Firm would pursue a *qui tam* action against Advanced Biohealing on Vinca's behalf. Eventually, Sweeney was included as a co-relator with Vinca, and Sweeney and Vinca decided to retain the Cohen Firm to pursue their allegations against Advanced Biohealing. Specifically, in January of 2011, Vinca and Sweeney entered into a contract for legal representation (the "Retainer Agreement") with the Cohen Firm,[4] in which the Cohen Firm would represent Vinca and Sweeney jointly as relators in a *qui tam* action against Advanced

---

[4] The Retainer Agreement identifies the firm as Cohen, Foster & Romine, P.A. (Doc. 491-1). Cohen, Foster & Romine, P.A. was a predecessor of Barry A. Cohen, P.A. (Doc. 170, at 1, n.2).

Biohealing (Docs. 491-1 & 490-2).[5] Pursuant to the Retainer Agreement, Vinca and Sweeney agreed to pay the Cohen Firm 40% of any recovery (Doc. 491-1, at 2). The Retainer Agreement was signed by Vinca and Sweeney and by Darken on behalf of the Cohen Firm (Doc. 491-1, at 5). The Retainer Agreement was also signed by Saady on behalf of the Saady Firm (Doc. 491-1, at 5). Pursuant to the Retainer Agreement, the Saady Firm would serve as additional counsel to Vinca and Sweeney in conjunction with the Cohen Firm, and the Saady Firm would receive 25% of the attorneys' fees, while the Cohen Firm would receive 75% (Doc. 491-1, at 4-5).

Throughout the Cohen Firm's representation of Vinca, Darken remained Vinca's primary point of contact with the Cohen Firm. Significantly, Vinca never conducted any substantive meetings or discussions with Cohen about his case until the two of them met in approximately November 2016 (*see* Doc. 485-49). Rather, Darken was the lead attorney on the matter and handled the majority of the work in the case, including most communications with Vinca and Sweeney as well as the drafting and filing of the pleadings and memoranda with the Department of Justice ("DOJ") and the Court.

---

[5] Vinca offered into evidence Doc. 490-2, which includes both the Retainer Agreement and the Statement of Client's Rights for Contingency Fees ("Statement of Client's Rights"), while the Cohen Firm offered into evidence Doc. 491-1, which consists of only the Retainer Agreement. Both documents were admitted into evidence. For ease of reference, the Retainer Agreement will be cited as Doc. 491-1, and the Statement of Client's Rights will be cited as Doc. 490-2.

On January 12, 2011, the same day Vinca signed the Retainer Agreement, Darken secured a proffer agreement (the "Proffer Letter") on Vinca's behalf with the United States Attorney's Office for the Middle District of Florida ("USAO") (Doc. 491-5). The Proffer Letter confirmed that, as of the date of the Proffer Letter, the government viewed Vinca as a subject or target of the healthcare fraud investigation (Doc. 491-5, at 1). Vinca's proffer interview with the United States took place that same afternoon (*see* Doc. 491-5, at 1).

Approximately one month after Vinca signed the Retainer Agreement, Vinca received a letter (the "Witness Letter"), secured by Darken, on February 11, 2011 from the USAO confirming that the DOJ was investigating Advanced Biohealing and one or more of its client-physicians for possible violations of Title 42 United States Code, Section 1320a-7b(b) (the anti-kickback provision), and other violations of federal law (Doc. 491-7). Importantly, the Witness Letter confirmed Vinca's status in the investigation was changed to a witness and, more significantly, confirmed that no statement, testimony, or other information provided by Vinca during his cooperation with the USAO could be used against him in any criminal case, other than in a prosecution for perjury, obstruction of justice, or giving a false statement (Doc. 491-7, at 1). The practical effect of the Witness Letter was that Vinca was granted complete immunity and was no longer exposed to criminal liability for any of his actions in the alleged kickback scheme while employed at Advanced Biohealing.

Prior to that, on January 25, 2011, Darken provided the DOJ with a relator disclosure statement (Doc. 491-2). The next day, the Cohen Firm filed the Complaint in this action (Doc. 2). Immediately after filing the Complaint, on January 27, 2011, Darken e-mailed the USAO to indicate that Vinca had been interviewed by federal agents pursuant to the Proffer Letter and to confirm that Vinca received transactional immunity for his conduct as a Sales Representative while employed at Advanced Biohealing (Doc. 491-6). On February 24, 2011, Darken sent to federal agents and the USAO a chart referencing exhibits from his relator memorandum that referenced specific physicians or physician groups involved in the kickback scheme (Doc. 491-3).

On July 15, 2011, Darken e-mailed Richard Nicholson ("Nicholson") and Randy Harwell ("Harwell") at the USAO a list of ten potential Advanced Biohealing witnesses (Doc. 491-10). Included in this list was Thomas Miller ("Miller"), who was also listed as a witness in the relator disclosure statement (Doc. 491-2, at 6). The e-mail correspondence stated that Miller "bought his options when he was let go so [I'm] not sure if he will speak because he's counting on that IPO to cash out. He was very pissed when he was let go though" (Doc. 491-10, at 2). Significantly, although Miller was identified as a potential witness, Former Counsel did not interview him in advance of filing the Complaint, which notably excluded any allegations as to VA claims.

Darken continued to provide pertinent information to the USAO to strengthen the DOJ's interest in Vinca and Sweeney's claims. On February 23,

2012, Darken e-mailed the USAO with substantive information that Sweeney provided to Darken (Doc. 491-12). Later, on August 6, 2013, Darken sent the USAO an e-mail from Vinca, in which Vinca provided a screenshot of a string of anonymous posts questioning Advanced Biohealing's sales tactics and ethics from a message board website (Doc. 491-13). Darken also provided the DOJ with well-researched and detailed e-mails and memoranda in support of Vinca and Sweeney's claims. For example, on April 21, 2015, Darken sent an e-mail to the USAO with case law supporting an analysis rejecting certain defenses and arguments that Advanced Biohealing intended to make in defense of the FCA claims (Doc. 491-16). Then, on June 9, 2015, Darken prepared a memorandum, which was even more detailed than the April 21, 2015 e-mail, and included a specific damage analysis as a supplement to his prior e-mails (Docs. 491-14; 491-15; 491-16; & 491-17). In the months that followed, Darken continued to send substantive legal analysis to the USAO and DOJ attorneys (Docs. 491-18; 491-19; 491-20; & 491-21). While Cohen was copied on many of these e-mails, he never sent any of the substantive e-mails.

Subsequently, on March 24, 2016, the USAO sent Darken a list of the top 100 Dermagraft billers, which Darken subsequently conveyed to Vinca and Sweeney (Doc. 491-22). Darken informed his clients that any helpful information they provided regarding the names in the list would potentially be favorable to their settlement terms (Doc. 491-22). In response, Vinca and Sweeney both provided information regarding certain providers on the list, and Darken conveyed this information to the government (Docs. 491-23; 491-24; 491-25; 491-26; 491-27; 491-

28; & 491-29). This ultimately resulted in Dr. Nimesh Patel ("Dr. Patel") being charged criminally and entering a guilty plea (Docs. 491-30 & 491-31).[6] Advanced Biohealing's employees, Charles Anthony "Tony" Ezell, Nicolo Rollo, and Daniel O'Briant also entered into plea agreements with the government (*see* Docs. 491-33; 491-34; & 491-35), at least, in part, because of Vinca's and Sweeney's cooperation and Darken's assistance in directing and shepherding their efforts.

As the DOJ continued to investigate the matter and continually requested that the Complaint and, later, the Vinca Complaint remain under seal, Vinca became frustrated with the delay of a final resolution of the matter (*see, e.g.*, Doc. 485-55, at 71-72, 80-81, & 95-96). Eventually, on August 2, 2016, Darken informed Vinca by e-mail that the DOJ and Advanced Biohealing had reached a proposed settlement of $350 million dollars (Doc. 485-1). Upon receiving the news about the Advanced Biohealing Settlement from Darken, Vinca e-mailed Saady and stated that "[y]our efforts were amazing. I will send u referrals forever[.] We did it!" (Doc. 485-1). Further, upon receiving a detailed e-mail from Darken about the Advanced Biohealing Settlement, Vinca acknowledged that the settlement represented a "fair and equitable" resolution (Doc. 485-47).

As a result of the significant developments in the case, Former Counsel scheduled a meeting with Vinca and Sweeney for November 21, 2016 and provided an agenda for the meeting (Doc. 485-6). The November 21, 2016 meeting marked

---

[6] Notably, Vinca actively participated in the investigation of Dr. Patel by meeting with Dr. Patel while equipped with an audio-recording device.

the first time that Cohen and Vinca met and engaged in substantive conversations about the *qui tam* matter (*see* Doc. 485-49). Approximately one month later, Vinca and Sweeney entered into a universal settlement agreement with the United States and Advanced Biohealing (Doc. 491-37). The settlement agreement was signed by Vinca and Sweeney and by Darken on behalf of the Cohen Firm (Doc. 491-37).

At the same time the DOJ was negotiating with Advanced Biohealing, the Cohen Firm also continued negotiations with Advanced Biohealing to resolve Vinca's Retaliation Claim, as asserted in Count II of the Vinca Complaint. Vinca later agreed to settle the Retaliation Claim for $385,000.00 (Doc. 490-3, at 3; Doc. 490-4, at 4). As part of that settlement for Vinca's Retaliation Claim, $92,000 was paid to the Cohen Firm as statutory attorney's fees (Doc. 490-3, at 3; 490-4, at 1-2). On February 1, 2017, Vinca sent Cohen an e-mail asking whether he could obtain a portion of the statutory fees to help him buy property in Odessa (Doc. 490-5). Prompted by Vinca's inquiry, Darken sent an e-mail on the same day to Domenic Massari ("Massari") asking Massari to respond to Vinca's e-mail request (Doc. 490-5). Ultimately, the Cohen Firm maintained the $92,000 statutory fees with the understanding that any attorney's fees recovered from the *qui tam* matter would be offset by the $92,000 statutory fees.

Meanwhile, on January 11, 2017, the DOJ formally announced that Advanced Biohealing agreed to pay approximately $350 million to settle federal and state FCA allegations, an amount which, at that time, represented the largest FCA recovery by the United States in a kickback case involving a medical device (Doc.

14

491-36). The press release announcing the Advanced Biohealing Settlement identified all six of the pending *qui tam* cases (Doc. 491-36). Given the competing *qui tam* cases, Former Counsel's focus shifted to resolving the various relators' shares from each of the six cases. To that end, the Cohen Firm attempted to negotiate with counsel for the other five relator cases to see if a settlement could be reached. Given the demands of the other relators, however, a settlement was not reached. Due to the failed settlement talks amongst the relators, the DOJ announced that it would make its own determination as to the appropriate share each relator should be allocated from the Advanced Biohealing Settlement. Thus, starting on March 27, 2017, and in the weeks that followed, the Cohen Firm, through Darken, sent letters, PowerPoint presentations, supporting documents, and other legal analysis and memoranda to the DOJ in support of Vinca's and Sweeney's relator share claims and to establish the basis for Vinca's and Sweeney's arguments regarding their entitlement to "first-to-file"[7] status (Docs. 491-38; 491-39; 491-40; 491-41; 491-42; 491-43; 491-44; 491-45; 491-46; 491-47; 491-48; 491-49; & 491-50). The PowerPoint presentations contained an abundance of case law and dense, substantive legal analysis in support of Vinca's and Sweeney's positions (*see, e.g.,* Doc. 491-42).

---

[7] When a relator files a *qui tam* action, "no person other than the Government may intervene or bring a related action based on the facts underlying the pending action." 31 U.S.C. § 3730(b)(5). This provision is often called the "first-to-file rule." Per this rule, "once one suit has been filed by a relator or by the government, all other suits against the same defendant based on the same kind of conduct would be barred." *Cooper v. Blue Cross & Blue Shield of Fla., Inc.*, 19 F.3d 562, 567 (11th Cir. 1994).

Eventually, on May 22, 2017, the DOJ announced its determination as to the relators' claims in a letter authored by Nicholson ("Nicholson Letter"), in which the government proposed percentage allocations to each of the relators from the Advanced Biohealing Settlement proceeds of $345,521,261.92 (Doc. 491-51). Specifically, the DOJ proposed to allocate 55.155% or $190,573,308.00 of the Advanced Biohealing Settlement proceeds to Vinca and Sweeney since "the Complaint in the Vinca/Sweeney Action was the first one adequately to allege that [Advanced Biohealing] knowingly caused kickback-tainted false claims to be made to Medicare" (Doc. 491-51, at 11). Significantly, the DOJ allotted 95.469% of the total Advanced Biohealing Settlement proceeds to the kickback claims, with Vinca and Sweeney getting 55.155% and Harvey getting 40.134% (Doc. 491-51, at 11). The remaining 4.531% of the Advanced Biohealing Settlement proceeds were allocated amongst the remaining relators, relators 3, 4, 5, and 6, (collectively, "Remaining Relators") with Medolla receiving 3.5299%, the Petty relators receiving 0.4%, Webb receiving 0.35%, and Montecalvo receiving 0.25% (Doc. 491-51, at 11-12).

Even though Vinca and Sweeney received the largest allotment of the settlement funds by the DOJ, the Cohen Firm pursued litigation to argue that Vinca and Sweeney were entitled to 99% of the settlement fund. Accordingly, Darken sought to consolidate all the FCA *qui tam* cases pursuant to Rule 42(a), Federal Rules of Civil Procedure (Doc. 491-52). Two days later, Darken moved to be

deemed the first-to-file as to the kickback claim portion of the United States' settlement with Advanced Biohealing ("First-to-File Motion") (Doc. 491-53).

Additionally, the Cohen Firm vigorously attacked the Remaining Relators' claims. Specifically, on July 6, 2017, Darken moved (1) to have Relator Webb's "fraudulently manipulating Medicare reimbursement amount" claim and Relator Montecalvo's "inflating Dermagraft's average sales price" claim Valued at $0 of the Advanced Biohealing Settlement proceeds (Doc. 491-57), (2) to limit Relator Montecalvo's relator share award for his non-kickback and non-off label promotion claims to *de minimis* value (Doc. 491-58), (3) to limit Relator Petty's relator share award for non-kickback and non-off label promotion claims to *de minimis* value (Doc. 491-59), and (4) to have the settlement proceeds of off-label promotion claims of Relator Petty, Relator Webb, and Relator Montecalvo valued at $0 (Doc. 491-60). Separately, Harvey moved for a ruling that he was entitled to a relator's share of the portion of the settlement relating to payments made by the VA ("Motion for Ruling") on July 11, 2017 (Doc. 491-56). By his motion, Harvey asserted that his relator's share should not be precluded by the "first-to-file rule" because the Harvey Complaint alleged kickbacks based on different conduct by different Advanced Biohealing employees, directed at a different set of medical providers, and leading to the direct submission by of false claims to the VA (Doc. 491-56, at 18). Harvey specifically argued that the kickback witnesses related to the Vinca Complaint— private doctors—did not witness or take kickbacks that led to payments by the VA (Doc. 491-56, at 9-12 & 18-20). The government filed an omnibus response to all

the pending motions (Doc. 114), to which Darken submitted a reply on behalf of Vinca and Sweeney on (Doc. 118).

Prior to the submission of the government's omnibus response and Darken's reply brief, while seeking to resolve the entire matter prior to resolution by a court order, the matter was mediated on September 25, 2017. Before the mediation, Vinca and Sweeney indicated that they would not settle for less than an allotment of 70% of the Advanced Biohealing Settlement proceeds. During the mediation, Vinca, Sweeney, Darken, Cohen and Massari all participated. Notably, Massari was a disbarred lawyer working at the Cohen Firm, who was disbarred by the Florida Bar in 2002 for the misappropriation of client funds (Doc. 490-1). According to Vinca, when he first met Massari he believed Massari to be a retired lawyer working as a consultant at the Cohen Firm, and he was never advised by anyone that Massari had been disbarred. Although he never expressed this to anyone at the time, Vinca questioned why Massari was so engaged at the mediation and was concerned about Massari's participation during the mediation.

The mediation proved fruitless, as no one even proposed a formal settlement for consideration by any of the relators. Rather, all relators sought a greater amount than any was willing to compromise or forego. Vinca and Sweeney were understandably frustrated with the failure to reach a settlement. Vinca contacted Saady by e-mail and phone to express his frustration and to discuss with Saady that he and Sweeney discussed the matter and changed their positions regarding their settlement demands (Doc. 485-13). Vinca indicated that perhaps "this position

would have helped us yesterday, if we offered it up early on as the mediator mentioned us going to 55-65%. Maybe not. At this point we're willing to drop to 60% to get this settled" (Doc. 485-13, at 2). Shortly after, on September 26, 2017, Vinca, in a series of e-mails, corresponded with Sweeney, Darken, Cohen, Massari, and Saady regarding potential settlement terms and commending them for everything they had done thus far but expressed that his and Sweeney's position had changed by stating that "[o]ur floor would be 55%, which is almost where we feel this is going to end up no matter what happens if we wait a few years" (Doc. 491-62).

Vinca, Sweeney, Darken, Cohen, and Saady then held a conference call to discuss the failed mediation and Vinca and Sweeney's changed positions. Prior to the conference call, Massari e-mailed Darken and Cohen a detailed analysis about potential settlement options and resulting monies from those options to Vinca and Sweeney and the Cohen Firm as fees (Doc. 490-11). The conference call was emotionally charged, as the continued delay in getting a final resolution to the matter was taxing on Vinca and Sweeney because, at that time, both experienced significant financial constraints. During the call, Vinca and Sweeney expressed a willingness to drop their demands to a 55% allotment of the Advanced Biohealing Settlement proceeds. In response, Darken, Cohen, and Saady explained to Vinca and Sweeney the difficulties presented in communicating a change of position to the other relators without possibly showing a perceived weakness in their settlement position. Accordingly, Darken, Cohen, and Saady advised Vinca and Sweeney that

such a course of action would prove unwise. Ultimately, Vinca and Sweeney agreed that it would be best to litigate the matter and let the Court decide the allotment of settlement proceeds rather than immediately reducing their initial settlement demands down to a 55% allotment.

As a follow-up to the conference call, Cohen sent an e-mail to Vinca and Sweeney expressing his understanding with their frustration about the failed mediation (Doc. 485-50). In the e-mail, Cohen reiterated his advice that, rather than immediately reduce their settlement demands, it would be best to wait and see the DOJ's omnibus response to the pending motions, as well as the Cohen Firm's reply to the DOJ response, and then decide whether they should revisit their positions or allow the Court to enter a ruling based on the filings (Doc. 485-50). Additionally, Cohen expressed in the e-mail that the Cohen Firm planned to attempt to negotiate with Harvey directly to determine if he would enter into a separate agreement with Vinca and Sweeney (Doc. 485-50). Cohen further stated that:

> Before I conclude, I know that a salient concern is your financial plight until this matter resolves one way or the other. Although it is unethical for firms to advance money to clients under these circumstances, there do exist companies which advance money at a *substantial interest rate*, which you may want to consider using in this case. For example, borrowing $100,000 to keep you going during the course of this litigation, which may affect your decision to settle for substantially less than you are entitled to receive. It is something I can look into for you if you are interested.

(Doc. 485-50) (emphasis added). Vinca and Sweeney again agreed to wait before communicating a reduction in their settlement demands, but also decided to pursue a "gap loan," as suggested by Cohen, and requested that Former Counsel assist in

obtaining a gap loan for them (*See, e.g.,* Doc. 491-64). Former Counsel eventually directed Vinca and Sweeney to Client Legal Funding ("CLF") as a lender to procure a gap loan during the pendency of their *qui tam* action (*see* Doc. 491-65). To that end, on November 1, 2017, Massari sent an e-mail stating, in relevant part:

> The transaction will be a sale of a small part of your award.
>
> This will provide $50k to Brian, $40k to Jen and $10k (10%) for broker's fee (the Lender actually pays this from your proceeds as a cost), which we have determined is standard for the $100k amount. A broker's fee goes down on amount over $250k.
>
> Brian and Jen with jointly be liable for the payback.
>
> The payback amount is structured to increases monthly based on the time the funds are out. From what we understand, it will take a year for the amount you will have to pay back to double. So much better than the other deals being offered.

(Doc. 491-65, at 1). Cohen responded to Massari's e-mail by stating "[g]reat job" and Vinca responded by stating "[a]ppreciate the hard work and quick update!" (Doc. 491-65, at 1). Ultimately, Vinca and Sweeney accepted the gap loan from CLF and were provided the funds from the loan on approximately November 14, 2017 (*see* Docs. 490-12; 491-65; 491-66; 491-67; 491-68; & 491-69).

While aiding Vinca and Sweeney in procuring a gap loan, the Cohen Firm continued settlement talks with Harvey to come to an agreement solely with Harvey. Previously, in January 2017, the Cohen Firm attempted to negotiate a settlement agreement ("First Settlement Agreement") with Harvey but was unsuccessful at that time. Notably, during the discussions about the First Settlement Agreement in January 2017, Vinca first met Massari, as Massari also participated

in the discussions. Massari was also intimately involved with the renewed settlement discussions with Harvey, as he was the architect of the proposed settlement to offer to Harvey (Doc. 490-11). Upon the renewed settlement discussions, the Cohen Firm successfully negotiated an agreement with Harvey, which included very favorable terms for Vinca and Sweeney, and, on October 1, 2017, Darken sent Vinca and Sweeney a detailed e-mail outlining the proposed agreement ("Second Settlement Agreement") with Harvey (Doc. 485-15). Subsequently, on October 6, 2017, the same date Former Counsel submitted a reply to the DOJ's omnibus response, Vinca and Sweeney entered into the Second Settlement Agreement with Harvey, whereupon Vinca and Sweeney agreed with Harvey to a fixed split of the proceeds according to predetermined percentage allocations following final judgment resolving all six *qui tam* cases (Doc. 491-63).

The Second Settlement Agreement operated as a risk-sharing agreement amongst Vinca and Sweeney with Harvey, as the relators for the top two *qui tam* actions based upon the DOJ's determination in the Nicholson Letter. Harvey faced the risk of being barred from any recovery if the Court agreed with Vinca's and Sweeney's First-to-File Motion, while Vinca and Sweeney faced the potential of receiving less recovery from the settlement proceeds. Vinca and Sweeney thus entered into the Second Settlement Agreement with Harvey to mitigate their respective risks. Pursuant to its terms, the Second Settlement Agreement would only apply upon entry of a final judgement entered by the Court (Doc. 491-63, ¶4). Significantly, Former Counsel was able to secure a term in the Second Settlement

Agreement stating that, if the Court agreed with the DOJ's allotment of approximately 5% to the Remaining Relators, then, as depicted in the table below, Vinca and Sweeney would receive 74.5% of the Advanced Biohealing Settlement proceeds instead of the DOJ's recommended 55.155% and the 70% Vinca and Sweeney sought earlier during the September 2017 mediation:

Assumes Settlement Amount of:     **$345,521,262.92**

| RELATOR HARVEY | | | |
|---|---|---|---|
| Relator's 3, 4, 5, 6 | Harvey % of Split | Overall Net % to Harvey | Gross Relator Share |
| 0% | | 27% | $93,290,740.99 |
| 5% | 25.5% | 24.225% | $83,702,525.94 |
| 10% | 24.0% | 21.6% | $74,632,592.79 |
| 15% | 22.5% | 19.125% | $66,080,941.53 |
| 20% | 21% | 16.8% | $58,047,572.17 |
| 25% | 19.0% | 14.25% | $49,236,779.97 |
| 30% | 16.5% | 11.55% | $39,907,705.87 |
| RELATORS VINCA/SWEENEY | | | |
| Relator's 3, 4, 5, 6 | Vinca/Sweeney % of Split | Overall Net % to Vinca/Sweeney | Gross Relator Share |
| 0% | | 73.00% | $252,230,521.93 |
| 5% | 74.5% | 70.775% | $244,542,673.83 |
| 10% | 76% | 68.4% | $236,336,543.84 |
| 15% | 77.5% | 65.875% | $227,612,131.95 |
| 20% | 79% | 63.20% | $218,369,438.17 |
| 25% | 81.0% | 60.75% | $209,904,167.22 |
| 30% | 83.5% | 58.45% | $201,957,178.18 |

(Doc. 491-63, Ex. A). As with the original offer proposed to Harvey, Massari predominately created and drafted the financial terms of the Second Settlement Agreement. Further, Massari directly communicated with Harvey's attorney about the proposed terms during the negotiations (Doc. 490-22).

On November 20, 2017, the Court issued an order determining what portions the Advanced Biohealing Settlement proceeds should be attributed to each of the

six *qui tam* cases ("Allocation Order") (Doc. 131). The Allocation Order adopted and followed the DOJ's recommended allocations of the settlement proceeds as outlined in the Nicholson Letter (Doc. 131, at 16). Former Counsel's efforts surrounding the Second Settlement Agreement with Harvey thus were successful, as Massari then informed Vinca and Sweeney in an e-mail stating that, based on the Court's Allocation Order and the Second Settlement Agreement, they were positioned to recover $49 million dollars, absent any changes upon an appeal (Doc. 485-51). Darken shared this news with Vinca and Sweeney in a November 20, 2017 e-mail, and Vinca expressed his pleasure with the news by responding "[g]reat news" with three "thumbs up" emojis (Doc. 491-71). Anxious to conclude the matter, Vinca repeatedly followed up with Darken to inquire about whether any of the Remaining Relators filed an appeal on the Allocation Order. Namely, on November 28, 2017; December 4, 2017; and December 28, 2017, Vinca sent an e-mail to Darken inquiring about the status of any potential appeals by the Remaining Relators (Docs. 491-72; 491-74; & 491-77). Subsequently, Montecalvo appealed the Allocation Order on February 2, 2018 (Doc. 148), and Darken informed Vinca about the appeal on February 4, 2018 (Doc. 492-36).

Notably, the Allocation Order expressly reserved ruling on any relators' share[8] of the settlement proceeds by stating that "[t]he issue of where in the 15-25%

---

[8] Pursuant to 31 U.S.C. § 3730(d)(1), in an FCA case where the government intervenes, a relator shall receive "at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claims depending upon the extent to which the person substantially contributed to the prosecution of the action." This is commonly referred to as

range the Relators' share should fall is one that is first subject to negotiation between the Relator and the Government" (Doc. 131, at 2). As early as January 2017, Vinca inquired about what percentage the Cohen Firm would seek for his relator's share and suggested that Cohen seek a 20% relator's share (Doc. 492-22). Initially, on April 21, 2017, the Cohen Firm argued in a detailed letter to the DOJ and USAO, supported by facts and law, that the DOJ award Vinca and Sweeney a 22% relator's share (Doc. 491-50). The DOJ did not immediately respond to the Cohen Firm's request for a 22% relator's share.

After entry of the Allocation Order in November 2017, Darken initiated informal discussions with Nicholson about the relator's share for Vinca and Sweeney. During those discussions, Nicholson indicated that he would support a 20% relator's share for Vinca and Sweeney. On December 5, 2017, Darken sent a detailed e-mail to Vinca explaining Darken's conversation with Nicholson regarding the DOJ's position that Vinca's relator's share should be 20%, and Vinca quickly replied by stating "Thank you Kevin" (Doc. 491-75). Subsequently, on January 12, 2018, Darken followed up with Nicholson to inquire on the status of the DOJ's approval of the 20% relator's share for Vinca and Sweeney (Doc. 492-5).

A week later, Nicholson sent an e-mail to all counsel informing them of the DOJ's determination regarding each of the relators' shares, in which he indicated that the DOJ determined that Vinca and Sweeney should obtain a 20% relator's

---

the "relator's share." Any relator's share stipulated to by the DOJ must be approved by the Assistant Attorney General of the Civil Division.

share, equal to an amount of $38,114,662, which constituted the highest percentage of any of the relators' shares (Doc. 492-9, at 2). Darken quickly forwarded Nicholson's e-mail to Vinca and Sweeney, to which Vinca responded by stating "Ok agreed" (Doc. 492-9, at 1). Soon thereafter, on January 24, 2018, Nicholson e-mailed Darken to again formally confirm that the DOJ had approved Vinca and Sweeney's 20% relator share, which Darken forwarded on the same day to Vinca and Sweeney (Doc. 492-10). Also, on January 24, 2018, Nicholson e-mailed all counsel requesting confirmation that their respective clients would accept the DOJ's recommended relator's share (Doc. 492-35). Darken sent the e-mail directly to Vinca, and Vinca replied "Ok" the next day (Doc. 492-35).

Given the agreement between the DOJ and Vinca and Sweeney, Darken filed a Notice to the Court, informing the Court that "Relators Vinca and Sweeney have reached an agreement with the Government as to the appropriate relator share percentage" (Doc. 147).[9] Absent any change in circumstances upon an appeal, Vinca and Sweeney were in a position by January 25, 2018, based upon Former Counsel's litigation efforts before the Court and in securing the Second Settlement Agreement with Harvey, to obtain a relator's share of $51,482,668.03,[10] as

---

[9] Listed below Darken's signature in the signature block is an e-mail address for Darken identified as kdarken@tampalawfirm.com and listing the firm name of "The Barry A. Cohen Legal Team" (Doc. 147).

[10] This calculation is based upon the total settlement proceeds amount of $345,521,261.92 identified in the Nicholson Letter (Doc. 491-51), the 74.5% share agreed to in the Second Settlement Agreement with Harvey (Doc. 491-63), and the 20% relator share agreed to with the government (Doc. 492-35), which is: $345,521,261.92 x 74.5% = $257,413,340.13 x 20% = $51,482,668.03.

compared to the DOJ's stipulated relator's share of $38,114,662.00.

Though Vinca remained generally satisfied with Former Counsel's efforts prior to the September 25, 2017 mediation, the failed mediation eroded Vinca's confidence in Former Counsel. Importantly, Vinca was frustrated by the failure to obtain closure in the case and angered because he believed that, had Former Counsel asserted the VA claims in the Vinca Complaint, the matter would have reached resolution sooner. Vinca's frustrations grew, as he felt that the Cohen Firm was not timely aiding him to obtain a gap loan to help confront his financial stressors. For example, on October 20, 2017, Vinca e-mailed Cohen, Darken, and Massari an apology, stating that he "wanted to take a moment [and] apologize for being a little brash the other day. It's not personal, and I hope it hasn't been taken personal[,]" that he was "[j]ust being bombed with financial demands[,]" and that he was "[u]nder a lot of STRESS, so please understand and except my apology" (Doc. 485-19). As noted, both Vinca and Sweeney were anxious to obtain a gap loan because they faced unemployment and significant financial burdens at that time, as articulated by Sweeney on October 17, 2017, when she communicated her dire circumstances to Former Counsel, including her concern as to whether she could pay her next mortgage payment (Doc. 485-18, at 2).

At the end of 2017, Vinca's frustrations with Former Counsel grew as the case did not conclude. Around the same time, the Cohen Firm was confronted with devastating news on two fronts. First, the Cohen Firm faced significant debts, including a multi-million debt owed to Counsel Financial Services, LLC ("CFS")

(*see* Doc. 419). Second, and even more catastrophic, Cohen was sadly diagnosed with leukemia. Cohen instructed Darken to ask Vinca and Sweeney whether they would consider a pre-payment of attorney's fees. Based on Cohen's request, Darken and Massari conducted a phone conference with Vinca and Sweeney on December 15, 2017, during which Massari offered a proposal for Vinca's and Sweeney's consideration about the pre-payment of a portion of attorney's fees. Massari then followed up with an e-mail memorializing the proposal in which Vinca and Sweeney would borrow $200,000 to $250,000 of nonrecourse debt to advance legal fees to the Cohen Firm (Docs. 490-14; 491-76). Massari indicated that if Vinca and Sweeney agreed then they would get a $50,000 fee reduction because of them borrowing this money (Docs. 490-14; 491-76). Vinca and Sweeney never agreed to the proposal.

Given Cohen's declining health and the solvency of the Cohen Firm, Darken and other employees were terminated soon after the December 15, 2017 phone conference.[11] Notwithstanding, the Cohen Firm allegedly entered into an agreement with Darken and CFS, whereby Darken would remain on Vinca's and Sweeney's case as additional counsel, as well as other Cohen Firm cases (*see* Doc. 231-2). Darken asserted that the Cohen Firm believed it was appropriate to retain Darken in such capacity on Vinca's case, since the Retainer Agreement provided that "if it becomes necessary or appropriate, in the [Cohen Firm's] judgment, to

---

[11] Ultimately, the Cohen Firm closed its office at the end of January 2018, and the last day of employment for any Cohen Firm employee was January 31, 2018 (Doc. 217-2, ¶¶2-3). The record does not, however, clearly indicate when the Cohen Firm ultimately dissolved.

retain additional attorneys to represent [Vinca and Sweeney] in pursuit of these Claims, then the [Cohen Firm] may retain such additional counsel as long as any fees payable to such additional counsel are paid by the [Cohen Firm] and the retention of such additional counsel does not increase the amount of the total Attorneys' fees payable under this agreement" (Doc. 491-1, at 2). After Darken was retained on Vinca's case by the Cohen Firm as additional counsel, Vinca was never provided a new retainer agreement for his consideration, contrary to the terms of the "Statement of Client's Rights for Contingency Fees," which stated that "[i]f your lawyer takes the case and later decides to refer it to another lawyer or to associate with other lawyers, you should sign a new contract, which includes the new lawyers" (Doc. 490-2, at 7). In fact, after his employment terminated with the Cohen Firm, Darken started his own firm, Kevin J. Darken Law Group, LLC (the "Darken Firm") on December 20, 2017 (Doc. 490-15). The next day, Cohen advised Saady about Darken's new role on Vinca's case, and Saady discussed it with Darken later that same day (Doc. 490-29, at 495).

Around this time period Vinca discovered on the internet that Massari had been disbarred by the Florida Bar and that the Cohen Firm was having financial difficulties. Upon learning about Massari's status with the Florida Bar and the Cohen Firm's financial issues, Vinca's concerns about Former Counsel were heightened significantly, which prompted him to discuss the matter with a friend who was a lawyer at Baker Hostetler. As Vinca became more alarmed about Former Counsel, he remained hopeful that the matter would be resolved with the Allocation

Order, and, therefore, he continued to inquire if any appeals had been filed. For instance, on December 28, 2017, Vinca inquired about the status of any appeals, to which Darken responded that no appeals had been filed but that Webb had filed a motion for the Court to reconsider the Allocation Order (Doc. 490-29, at 497). Notably, Darken did not inform Vinca at that time about his leaving the Cohen Firm.

A few days after that, on January 2, 2018, Darken e-mailed Vinca and Sweeney to schedule a conference call later that day (Doc. 491-78). Vinca was unaware of the reason for the call but wondered whether it regarded any appeals being filed, as he responded to Darken's e-mail by asking "[a]ny appeals filed" (Doc. 491-78). Later that day, Darken, Massari, and Saady held a phone conference with Vinca and Sweeney during which they informed Vinca and Sweeney for the first time that Cohen was ill and would have to withdraw from their case. Vinca was shaken to learn this new development that Cohen was no longer going to work on his case, and he expressed his concerns about the matter as well as his frustrations regarding his financial status, including his displeasure with the terms of the gap loan.

During the evidentiary hearing, Vinca testified that, almost immediately after the conference call with everyone else, Massari called him directly and told him, in essence, that Cohen was just going to have to back down on his cases but that everything would still be fine. Vinca further stated that, in an effort to help with Vinca's financial concerns, Massari told him that they could set up an arrangement

so that Vinca was employed by the Cohen Firm and put on the Cohen Firm's payroll in an effort to aid Vinca in avoiding any payment of monies from the eventual settlement to his wife as part of their divorce.

As the record indicates, on January 5, 2018, Vinca e-mailed Darken stating that he "would like to meet with [Darken] in person this coming Monday if possible" (Doc. 491-79). Darken responded by asking whether Vinca wanted to meet with just Darken or Darken and Massari, and Vinca responded that it did not matter (Doc. 491-79). Darken then scheduled a meeting with Vinca on January 8, 2018. Prior to that meeting, Darken e-mailed Vinca and Sweeney earlier on January 8, 2018 and notified them in two separate e-mails about other sources of funding for them to obtain an additional loan pending the resolution of the case (Docs. 491-80 & 491-81).

Given his frustrations with Former Counsel, coupled with the news about Cohen's health, Vinca sought advice from Current Counsel prior to meeting with Darken. Specifically, during the afternoon of January 8, 2018, Vinca held a conference call with Current Counsel, which was memorialized in an e-mail time stamped at 3:46:46 p.m. that day (Doc. 491-82). Essentially, Current Counsel identified Vinca's concerns as: (1) the solvency of the Cohen Firm; (2) the Cohen Firm's request that Vinca and Sweeney take on high-interest debt against their judgment in order to pay the Cohen Firm advanced fees while simultaneously coordinating a personal loan for Vinca and Sweeney; (3) the interest rate of the gap loan the Cohen Firm helped Vinca obtain; (4) Massari's participation on Vinca's

31

case as a disbarred lawyer; and (5) the withdrawal of Cohen from Vinca's case (Doc. 491-82). Current Counsel's e-mail stated that "[t]oday we discussed your concerns and brought Sweeney into the discussion by telephone. We agreed that you will meet with Kevin Darken this afternoon and discuss a variety of concerns about the case, in hopes he will be transparent with you and provide reasonable responses. You will communicate with us what your intentions are going forward regarding representation on this matter" (Doc. 491-82, at 2). Notably, as of at least January 10, 2018, Vinca began forwarding to Current Counsel prior correspondence that was sent by Darken and Massari (Doc. 491-83).

Meanwhile, at the end of the day on January 8, 2018, Darken and Vinca met in person at the Cohen Firm office. During the meeting, Vinca expressed to Darken the same concerns memorialized in Current Counsel's e-mail from earlier in the day, and Vinca indicated that he began considering retaining a new lawyer to represent him in the *qui tam* matter. The meeting became volatile, as Darken responded to Vinca's comments with profane-laced responses. Later, during the evening of January 8, 2018, Darken sent an e-mail time stamped at 11:35 p.m. to Vinca, Sweeney, and Saady, in which Darken detailed his opinion about the potential consequences to Vinca if he retained new counsel, including the implications of a charging lien that would be asserted by the Cohen Firm (Doc. 491-84). Darken concluded the e-mail by stating that "[i]n any event, we need to know if you are discharging us" (Doc. 491-84). Significantly, Vinca did not discharge Former Counsel at that time.

The next day, on the morning of January 9, 2018, Vinca responded to Darken's e-mail by stating "[we'll] let you know our decision by tomorrow" (Doc. 492-1). Darken forwarded Vinca's e-mail to Saady (Doc. 490-29, at 530). The following day, Darken e-mailed Vinca again and expressed to Vinca that, even though the Retainer Agreement did not contemplate attorney's fees for any appeals, Darken would be willing to enter into a new fee agreement wherein he would waive any additional fees for work done on any appeals (Doc. 492-2). Importantly, the e-mail stated that "[a]lthough [Darken] (and Barry and Claire) will not agree to reduce the 40 percent contingent fee, [he is] prepared as part of a new fee agreement to waive any additional fee for work on any appeals" (Doc. 492-2).

Also, on January 10, 2018, Sweeney corresponded with Vinca and Current Counsel regarding a lengthy call that Sweeney held with Darken in which Darken was apologetic regarding losing his composure with Vinca during their January 8, 2018 meeting and that he welcomed the opportunity to meet with Vinca again (Doc. 492-3). In doing so, Sweeney forwarded Vinca's e-mail to Current Counsel, which stated that Darken wanted to apologize to Vinca, but that it "[s]ounds to [Vinca] as if [Darken's] in a corner" (Doc. 492-3). In the e-mail, Vinca also expressed his anger regarding the gap loan, noting that Darken kept referring him to Massari about being the one to help Vinca and Sweeney with their loans (Doc. 492-3).

Four days later, Saady e-mailed Darken and asked if he received any word from Vinca (Doc. 490-29, at 538). Subsequently, on January 16, 2018, Darken

circulated a draft letter to Cohen, Massari, and Saady but intended for Vinca from Cohen, which read:

> Dear Brian:
>
> I want to let you know that I am feeling better and no longer need to withdraw from your case.
>
> When you last met with Kevin Darken, you said you were considering getting a new lawyer for this case. Later you said you would let us know within a day or two, but to date I have not heard from you. I did not call you because I did not want to badger you and I wanted you to have sufficient information to make an informed decision.
>
> The time has come for us to know whether you want us to continue to protect your interest or whether you will make another choice. We need to know by Friday because we expect the Department of Justice will want us to confirm our clients' acceptance of a 20% relator share. In addition, when there is an appeal by one or more relators, I need to know on whose behalf I will be filing a notice of appearance. Finally, if you decide to seek another bridge loan, which we have made clear is solely your decision, then we could not sign off on your application if we were not representing you.
>
> Because of the temporary appearance of an adversarial relationship created by you at the last meeting with Kevin Darken, I need you to confirm that you still want my firm to represent you under the terms of our existing fee agreement. After that, we can all work together to achieve the best results for everyone.
>
> If you want to further discuss this subject, I would be happy to talk to you. But we can no longer make a decision by indecision.
>
> Regards,
> Barry Cohen

(Doc. 490-29, at 540-41). Though drafted, this letter was never sent to Vinca from Cohen. More importantly, it appears that Cohen never communicated with Vinca in 2018.

Next, on January 17, 2018, Vinca sent an e-mail to Darken, which copied to two lawyers from the Baker Hostetler law firm and in which Vinca detailed his dissatisfaction with Darken and the Cohen Firm (Doc. 492-7). Specifically, the e-mail stated:

Kevin,

I wanted to follow up on the firm's email, and our discussion from the other day. I don't feel I deserve to be treated the way I was considering some of the things that have transpired at the firm. Your tone and comments directed to me during our one on one meeting were unacceptable. Contrary to the email you sent about selling our small case to the government, I brought you the biggest Qui Tam case the firm has ever been involved in. There are plenty of other firms that would have ran with our case and achieved success.

I feel like the firm hasn't been transparent with us like you should be. You promised to inform us and keep us up to speed on all negotiations, dialogue with other relators, etc. That simply hasn't been happening. We have been asked to get on countless conference calls with only times given to us but no subject, agenda, or explanation is given in many instances. Most recently, Friday January 5th at 4:30, to be informed that Mr. Cohen is withdrawing from all his cases, and we weren't informed why on that call. Remember, Claire Saady referred us to Barry Cohen. I received another call a minute later from [Domenic Massari] who informed me that Barry was ill and that was why he was withdrawing from all his cases. However, what wasn't brought to our attention, was the financial status of the firm. We had to find out via the internet that the news published an article documenting the firm's financial debt Dec[.] 28, 2017. The article revealed Mr. Barry Cohen owed over 35 million dollars' worth of loans to lenders. This really raised red flags considering we were sent an email by your firm asking us to take out loans at the end of year so we could pay you advanced fees before our contingency case settles. This request was also brought up by [Domenic Massari] on our conference call, as well. This is very unethical, and something the Florida Bar would take very seriously.

After more research, I discovered Mr. [Massari] is a disbarred attorney working at your firm. He is handling these loans and making these loan requests to us. We contracted Mr. Barry Cohen to represent us,

not Mr. [Massari]. Never once did we receive an email, letter, or anything introducing or giving us full disclosure on [Domenic]'s job title, background at the firm, disbarment or why he is even involved. He has NEVER been introduced as a paralegal, but he said he was a retired attorney and "consultant". This has completely violated our attorney client privilege.

Months ago, we begged for financial assistance and we were promised and dragged along for weeks before we were given any solid responses or assistance which helped us finally gain a loan. It was to the point where we had to demand a conference call and another mediation date before anyone would hear us out and assist us. Now, based on information and belief, we were granted a loan that was orchestrated by the firm that far exceeded legal interest rates. We more or less have been a victim of usury by recommendation of the firm. You agreed to help ensure we get the best rate and deal possible. I firmly believe that hasn't been the case. I have to wonder if the firm just didn't really explore enough options, or is this because the firm owes 35 million dollars in back loans nobody would offer a better rate, or does the firm have a relationship with this lender in Clearwater[,] Florida?

We came to the firm with rock[-]hard evidence and overwhelming data for the Medicare and VA portion of this investigation. The firm has done many of these case over the years, but for some reason the VA complaint wasn't drafted correctly and now we had to cut a deal with Harvey relator 2 costing us millions. This isn't our fault! First to file has been shown to be very relevant in this case, starting with the DOJ and working its way to the most recent order by Judge Moody. We had to pursue an "On the Trail" argument because our complaint was filed properly by the Firm!

We hired the firm to do the job right, and it wasn't. You yourself admitted that you made mistakes drafting the VA portion of the complaint. We the clients shouldn't be penalized for this. You made statements in your office saying we got the Medicare and Harvey got the VA because that was his case. One can only wonder if that would have been the case if our complaint was filed properly?

We have had a ruling by Judge Moody for a while and been on countless conference calls and the consistent theme has been, "We're not sure if it's a final ruling". Why hasn't anyone filed a motion to the judge to request for final order? From someone looking from the outside in, it seems as if this case is being delayed on purpose. It doesn't make sense. We keep hearing "we are going to start preparing

36

our appeal". None of the other relators have filed an appeal to this point, and Jennifer nor I have authorized anyone to start any appeals.

Last year, I was also a first-hand witness to Jennifer being humiliated and sexually harassed at the firm. It was beyond belief. Unfortunately, at the time, I was a scared client and only hoping to move on with my recovery and I really didn't say much. This coupled with so many other events, is just unacceptable as you have our future in your hands. Jennifer called me about this and was extremely upset as she didn't even know I was in the room when she was humiliated on speaker phone. She called Claire a day later about this and never once was an apology or explanation given by the firm to either of us by anyone.

We signed a contract for 40% with the confidence that Barry Cohen would be representing us and representing with our best interest in mind. I don't feel nor do the facts reveal that he nor the firm handled this properly and ethically.

*I'm willing to let you continue to try and finish my portion of the case at a reduced rate of 30% with no additional appeal fees.* If you're willing to do so, I am willing to put the above in the rear-view mirror and we can move forward with more transparency and professionalism. In return, I will release all claims we have against your firm. Contrary to your email, this case isn't over. We haven't received a dime, you are mentioning appeals, you are wanting to double down on the DOJ allotted amounts to other relators and continue to give away more of our dollars. To me this is a sign of uncertainty, and clearly shows this case is far from over.

If the firm is willing to work something out, let me know.

Thank you,
Brian Vinca

(Doc. 492-7) (emphasis added). Although Vinca reiterated several grievances he

previously identified to Darken during the January 8 meeting, it appears that, for

the first time, he also included his concern about Former Counsel's failure to pursue

the VA Claim. This additional grievance prompted Darken to gather prior e-mail

exchanges with Vinca about the potential for a VA Claim and forward those e-mails

to Cohen, Massari, and Saady by stating: "See emails below from and to Brian Vinca concerning off-label usage of Dermagraft at VA hospitals. Vinca was not able to provide facts necessary to support this claim. There are no emails from Vinca regarding kickbacks to VA physicians or VA hospitals" (Doc. 490-29, at 546).

Of note, Vinca did not discharge Former Counsel in his January 17, 2018 e-mail but rather offered to remain with Former Counsel if Former Counsel would reduce the rate for attorney's fees to 30% instead of the 40% rate required by the Retainer Agreement. The next day, Darken responded to Vinca and stated that, even though he previously informed Vinca that Cohen would have to withdraw from his case, Cohen's condition had improved dramatically such that, pursuant to the Florida Bar rules, Cohen was no longer required to withdraw from Vinca's case and that Cohen did not intend to do so (Doc. 492-8). Darken apologized to Vinca for his assertive tone during the January 8, 2018 meeting but indicated that he was still offended by Vinca's alleged frustrations and viewed them as a "transparent attempt" by Vinca to avoid his "contractual obligations" (Doc. 492-8). Darken further asserted that Cohen and the Cohen Firm fully performed all obligations due under the original fee agreement and intended to enforce such agreement (Doc. 492-8). Again, although Darken discussed Cohen's intentions, Cohen himself never communicated directly with Vinca during this uncertain time period in January 2018.

Even though the attorney-client relationship between Vinca and Former Counsel became clouded starting around mid-December 2017, Former Counsel

38

continued to work on Vinca's case until Vinca formally discharged Former Counsel on March 21, 2018. For example, Former Counsel: (1) drafted and filed a response to Webb's Motion for Reconsideration in late December 2017 (Doc. 490-29, at 503-518 & 521-26); (2) informed Vinca on January 5, 2018 that the Court denied Webb's Motion for Reconsideration (Doc. 490-29, at 527-29); (3) inquired about the status of the relator's share with the DOJ on January 12, 2018 (Doc. 492-5); (4) provided updates to Vinca and Sweeney about the relator's share on January 13, 2017 (Doc. 490-29, at 535); (5) conducted research on the finality of the Allocation Order (Doc. 490-29, at 536-39); (6) communicated on January 16, 2018 with Vinca about research related to the finality of the Allocation Order (Doc. 492-6); (7) confirmed on January 19, 2018 that Vinca accepted the DOJ's offer of a 20% relator's share (Doc. 492-9); (8) informed Vinca and Sweeney on January 24, 2018 that the DOJ formally approved a 20% relator's share for their case (Doc. 490-29, at 563); (9) informed Vinca and Sweeney on February 4, 2018 that Montecalvo filed an appeal (Doc. 490-29, at 579-584); (10) discussed with Vinca and Sweeney on February 14, 2018 a proposed settlement offer from Medolla (Doc. 490-29, at 592-94); (11) communicated with Medolla's attorneys on February 16, 2018 that Vinca and Sweeney rejected Medolla's settlement offer (Doc. 490-29, at 595-96); (12) informed Vinca and Sweeney on February 22, 2018 that the Court stayed all relators' cases pending appeal (Doc. 490-29, at 602-04); (13) advised Vinca and Sweeney on February 26, 2018 that the case was selected for mediation by the Eleventh Circuit and was scheduled for a telephone mediation assessment conference on March 23,

2018 (Doc. 490-29, at 605-06); (14) drafted a memorandum on March 13, 2018, arguing that the Allocation Order was a final and appealable order (Doc. 490-29, at 611-14); (15) also on March 13, 2018, filed a jurisdictional response with the Eleventh Circuit regarding the other relators' pending appeals (Doc. 490-29, at 615-16);[12] (16) on March 15, 2018, communicated to Vinca and Sweeney when Montecalvo's appellate brief was due and provided Vinca and Sweeney with Medolla's notice of cross appeal (Doc. 490-29, at 619 & 624); and (17) additionally on March 15, 2018, attempted to schedule an interview for Vinca with a new DOJ attorney assigned to his case (Doc. 490-29, at 632).

Ultimately, Vinca terminated Former Counsel through a termination letter transmitted by Current Counsel via facsimile on March 21, 2018 (Doc. 485-28). In the termination letter, Current Counsel indicated that Current Counsel was taking over the matter pursuant to and requested that Former Counsel preserve and provide all material related to the matter (Doc. 485-28, at 3-6). Further, Current Counsel noted Massari's involvement in Vinca's case and requested that all communications about the case cease with Massari (Doc. 485-28, at 4). In addition,

---

[12] Sweeney inquired about Darken's law firm on March 14, 2018, stating "I noticed that the attached response indicates you are now representing us as 'Kevin J. Darken Law Group, LLC' and Barry is noted under you as 'Barry A. Cohen P.A.'. I know you have reassured us that if this change does happen, which it appears as though it has, it will not affect the case itself- are there any other impacts that we need to be aware of due to this change . . . [,]" to which Darken responded "no" (Doc. 490-19, at 2). Significantly, Darken previously asked Massari on February 9, 2018 "what do you think needs to occur for me to represent [Sweeney or Sweeney and Vinca] in the Court of Appeals," to which Massari responded "I think that you could continue to appear (using your LLC) as [being] associated with Barry. I think the fee agreement gives Barry the right to staff the case as he sees fit" (Doc. 490-17).

Current Counsel requested that Former Counsel provide information about any known professional malpractice insurance policy (Doc. 485-28, at 6).

**III.   <u>Analysis</u>**[13]

As noted above, the core issue that must be resolved under Former Counsel's charging liens is what amount of attorneys' fees, if any, Former Counsel should receive as a *quantum meruit* award from the $7,150,000 maintained in the Court's registry. Former Counsel asserts that the entire $7,150,000 should be awarded since Former Counsel fully performed the contingency required under the Retainer Agreement before Vinca terminated Former Counsel (Doc. 489, at 1).[14] Alternatively, Former Counsel argues that, if the Court determines that Former Counsel did not fully perform under the Retainer Agreement before Vinca terminated Former Counsel, Vinca terminated Former Counsel without cause and thus Former Counsel should still be awarded the $7,150,000 as a *quantum meruit* award because such an amount is equal to the reasonable value of Former Counsel's services (Doc. 489, at 10). Last, Former Counsel suggests that, even if the Court determines that Vinca terminated Former Counsel with cause before Former Counsel fully performed under the Retainer Agreement, Former Counsel should be awarded a *quantum meruit* award equaling the full amount being held in the Court's registry because it equals a reasonable value of Former Counsel's services and

---

[13] To the extent that any of the following conclusions of law may represent findings of fact, the undersigned adopts them as such.

[14] In addition to submitting its own arguments, the Saady Firm fully adopts all arguments briefed by the Cohen Firm (Doc. 488, at 2).

because Former Counsel committed no misconduct or any such alleged misconduct did not damage Vinca or rise to the level of warranting a fee forfeiture (Doc. 489, at 13).

Conversely, Vinca argues that Former Counsel should not be awarded any attorney's fees because Former Counsel did not fully perform under the Retainer Agreement and because Former Counsel was not terminated by Vinca, but rather Former Counsel abandoned Vinca (Doc. 487, at 5-10). In the alternative, Vinca argues that, if the Court determines that Vinca terminated Former Counsel, the Court should find that such termination was for cause, and that Vinca suffered actual damages resulting from Former Counsel's conduct, which conduct also warrants an additional forfeiture of fees given its malfeasance (Doc. 487, at 10-13). Vinca asserts that he was damaged by Former Counsel's failure to assert the VA claims in the Complaint or the Vinca Complaint (Doc. 487, at 13-16). Further, Vinca claims that Former Counsel committed misconduct by: (1) failing to reduce settlement demands after the September mediation, and instead arranging for a gap loan for Vinca and withholding $92,000 in statutory attorneys' fees; (2) allowing Massari to engage in the unlawful practice of law; and (3) by failing to provide full transparency regarding Cohen's health and the Cohen Firm's financial viability, while attempting to induce Vinca to obtain an additional loan to pre-pay attorneys' fees (Doc. 487, at 17-23). Vinca argues that such misconduct is so egregious that a forfeiture of the attorneys' fees is warranted (Doc. 487, at 24-25).

After consideration, the undersigned finds that Vinca terminated Former Counsel for cause and that Vinca suffered intangible harm from Former Counsel's conduct. Under the totality of the circumstances, however, the undersigned finds that a *quantum meruit* award is warranted given the significant services performed by Former Counsel. For the following reasons, therefore, the undersigned recommends that Former Counsel's charging liens be resolved by awarding $6,128,500 as a just *quantum meruit* award, which is fair to both Former Counsel and Vinca.

### A. Charging Lien

"'Federal courts, although they recognize no common-law lien in favor of attorneys, give effect to the laws of the states in which they are held.'" *Gottlieb v. GC Fin. Corp.*, 97 F. Supp. 2d 1310, 1311 (S.D. Fla. 1999) (quoting *Webster v. Sweat,* 65 F.2d 109, 110 (5th Cir. 1933)); *accord Zaklama v. Mount Sinai Med. Ctr.,* 906 F.2d 650, 652 (11th Cir. 1990) (indicating that the rights and obligations of parties to a contract that provides for attorneys' fees upon the happening of a contingency are governed by state law). Under Florida's common law, a charging lien may be utilized to enforce the equitable right of an attorney to have fees owed for legal services secured to the attorney by the judgment or recovery in a lawsuit. *See Sinclair, Louis, Siegel, Heath, Nussbaum & Zavertnik, P.A. v. Baucom,* 428 So.2d 1383, 1384 (Fla. 1983); *Flynn v. Sarasota Cnty. Pub. Hosp. Bd.,* 169 F. Supp. 2d 1363, 1368 (M.D. Fla. 2001). "No statutes outline the requirements for valid attorney's liens in Florida. Rather case law acts as the sole guide for both attorneys

43

and courts as to these liens." *Daniel Mones, P.A. v. Smith, Inc.,* 486 So.2d 559, 561 (Fla. 1986) (citations omitted). In Florida, the resolution of an attorney's charging lien is equitable in nature. *See Nichols v. Kroelinger,* 46 So.2d 722, 724 (Fla. 1950). To impose a charging lien, a court in equity must find: (1) an express or implied contract between the attorney and the client; (2) an express or implied understanding that payment is either contingent upon recovery or will be paid from the recovery; (3) an attempt by the client to avoid paying or a dispute as to the amount of the fee; and (4) a timely notice of a request for a lien. *Daniel Mones, P.A.*, 486 So.2d at 561; *Sinclair,* 428 So.2d at 1385.

Considering these factors, Former Counsel's charging liens are properly before the Court for resolution. Namely, (1) the Retainer Agreement between Vinca and Former Counsel expressly memorialized their agreement that 40% of any recovery constituted the appropriate compensation for attorneys' fees (Doc. 491-1); (2) the payment of attorneys' fees to Former Counsel is in dispute, since Vinca asserts that either no monies or limited monies should be paid to Former Counsel as attorneys' fees; and (3) Former Counsel timely submitted notice of their requests for charging liens.[15]

### 1.   The Saady Firm's Attorney's Fee Claim

As an initial matter, the Saady Firm argues, distinct from other arguments

---

[15] Former Counsel filed the disputed charging liens on May 15, 2018 (Doc. 167), and, almost a year later, on May 20, 2019, the district judge entered the Order on Joint Motion for Release of Funds in Court Registry, directing the Clerk to distribute the funds deposited into the Court registry and any accrued interest to the parties (Doc. 229).

put forth by the Cohen Firm, that the Saady Firm "should be fully paid its 25% of the [$7,150,000], plus interest, in a direct payment separate from [the Cohen Firm]" (Doc. 488, at 16). Essentially, the Saady Firm argues that, independent of any issues relating to the Cohen Firm, the Saady Firm fully performed its work under the Retainer Agreement thereby entitling the Saady Firm to a full 25% of the $7,150,000 (Doc. 488, at 5-14). The Saady Firm's argument is misplaced, however, as the Saady Firm's claim to any attorneys' fees is derivative to the Cohen Firm's claim.

The Retainer Agreement states that "**BRIAN VINCA** and **JENNIFER SWEENEY**, (**CLIENTS**), do hereby retain and employ the law firm of **COHEN, FOSTER, & ROMINE, P.A.**, (LAW FIRM) as attorneys to represent us jointly as relators in a *qui tam* action against **ADVANCED BIOHEALING** and related entities and individuals" (Doc. 491-1, at 1) (emphasis in original). The Retainer Agreement further provides that Vinca and Sweeney agreed to pay the Cohen Firm forty percent (40%) of any recovery (Doc. 491-1, at 2). Hence, Vinca and Sweeney only agreed to pay the Cohen Firm's attorneys' fees. As for any attorneys' fees to be paid to the Saady Firm, the Retainer Agreement expressly states that "CLIENTS consent and authorize the association of Cohen, Foster & Romine, P.A. (first law firm) and Saady & Saxe, P.A. (second law firm) as additional attorneys to represent us in connection with this agreement. CLIENTS further understand that the law firms will divide the attorney's fee in the following manner: 75% to Cohen, Foster & Romine, P.A. and 25% to Saady & Saxe, P.A." (Doc. 491-1, at 4-5). This provision does not demonstrate that Vinca and Sweeney agreed to pay any

attorneys' fees to the Saady Firm; instead, the provision puts Vinca and Sweeney on notice that the Cohen Firm has associated with the Saady Firm and agreed to divide the attorneys' fee with the Saady Firm.

The Saady Firm referred Vinca and Sweeney to the Cohen Firm to pursue their *qui tam* action. As the Retainer Agreement indicates, in consideration of the referral, the Cohen Firm would receive 40% of any recovery as attorneys' fees, and the Cohen Firm would then pay 25% of those attorneys' fees to the Saady Firm for the referral and the continued involvement on the matter (Doc. 491-1). Accordingly, under the Retainer Agreement, the Saady Firm's fee was contingent upon the Cohen Firm's fee. If the Cohen Firm fully performed under the Retainer Agreement, the Saady Firm would receive attorneys' fees as a derivative of the award to the Cohen Firm. Likewise, in consideration of a *quantum meruit* award, the Saady Firm's claims should be derivative of any award conferred upon the Cohen Firm. The undersigned therefore recommends that the Saady Firm's claim not be considered separately because any such claim by the Saady Firm depends upon the success or failure of Former Counsel's charging liens.

### 2.   Former Counsel Did Not Fully Perform Under the Retainer Agreement

Former Counsel asserts that they fully performed under the Retainer Agreement because the "contingency" contemplated under the Retainer Agreement occurred prior to Vinca discharging Former Counsel, and, therefore, Former Counsel is entitled to the entire $7,150,000 as attorneys' fees (Doc. 489, at 8). "The occurrence of the contingency prior to discharge of the attorney entitles that

attorney to his stated fees pursuant to the contingency fee contract as opposed to *quantum meruit*." *Zaklama*, 906 F.2d at 653. The full contingency fee is due to the discharged attorneys when they "did all that was required of them in order to recover their percentage of the judgment proceeds." *Id.* Stated differently, when an attorney "already obtained for [the client] the bargained-for object of representation" prior to discharge, the contractual contingency can be considered to have occurred prior to discharge entitling counsel to payment of the contingent fee percentage. *See In re Abilify (Aripiprazole) Prod. Liab. Litig.*, Case No. 3:16-mc-2734 & 3:18-cv-876, 2020 WL 2575506, at *6 (N.D. Fla. May 21, 2020).

In this instance, Former Counsel suggests that the "contingency" under the Retainer Agreement involved the following components: (1) the Court's Allocation Order and (2) the relator share agreement with the DOJ or a relator share award from the Court (Doc. 489, at 8). Former Counsel argues that it obtained both of those components before being fired in March 2018, by entry of the Allocation Order (Doc. 131) in November 2017 and by the 20% relator's share agreement with the DOJ, confirmed in January 2018 (Doc. 492-35). Former Counsel suggests that the required contingency under the Retainer Agreement occurred before Former Counsel was fired because Former Counsel already obtained for Vinca the bargained-for object of the representation outlined in the Retainer Agreement.

Contrary to Former Counsel's position, the Retainer Agreement does not reflect that attorneys' fees were contingent upon a resolution of the allocation of the Advanced Biohealing Settlement proceeds or of the relator's share award. Instead,

47

the Retainer Agreement dictates that "[a]s compensation for their services, CLIENTS agree to pay the LAW FIRM forty percent (40%) of any *recovery*" (Doc. 491-1, at 2) (emphasis added). In other words, attorneys' fees are contingent only upon Vinca obtaining a "recovery" in the matter. Former Counsel posits that a recovery was obtained for Vinca because Former Counsel "achieved the functional equivalent of a settlement agreement (through the combination of the allocation order and the relator share agreement with DOJ) before being fired …." (Doc. 489, at 10).

Under Florida law, a contingency defined as a "recovery" can occur when a client settles a claim even if the client does not receive his or her payment until after discharging his or her former counsel (Doc. 489, at 3-5). *See Eakin v. United Tech. Corp.*, 998 F. Supp. 1422, 1430 (S.D. Fla. 1998) (finding that, since a settlement had been reached between the parties, a recovery within the meaning of the contingency fee contract provision had been achieved); *Harrington v. Estate of Batchelor*, 924 So.2d 861, 862 (Fla. Dist. Ct. App. 2006) (stating that "[s]ince there is no dispute that a settlement agreement was executed settling one of the claims described in the fee agreements before the attorneys' representation was terminated, the attorneys are entitled to the agreed upon contingency fees"); *Cooper v. Ford & Sinclair, P.A.*, 888 So.2d 683, 690 (Fla. Dist. Ct. App. 2004) (finding that the contingency contemplated under the fee agreement occurred where the client discharged former counsel "after they negotiated the settlement offer"); *King v. Nelson*, 362 So.2d 727, 728 (Fla. Dist. Ct. App. 1978) (rejecting argument to limit former counsel's

compensation to *quantum meruit* where plaintiff agreed to a settlement "and it was subsequent to and not prior to his agreement to the settlement that he advised his first attorneys that he was discharging them"). Here, however, Former Counsel's argument misses the mark because no settlement of the claims occurred prior to Former Counsel's discharge. Unlike the cases relied upon by Former Counsel, wherein the parties reached a settlement – meaning a meeting of the minds between all necessary parties to settle the relevant claims – no such circumstances existed here.

Without question, Former Counsel performed well in securing Vinca a substantial percentage allotment of the Advanced Biohealing Settlement proceeds and in securing a 20% relator's share for Vinca. Notwithstanding, given that the Remaining Relators were not in agreement to the Allocation Order, Former Counsel did not achieve the "functional equivalent" of a settlement. To the contrary, given the pending appeal of the Allocation Order, no final determination of the proper allocation of the Advanced Biohealing Settlement proceeds to be awarded to Vinca and Sweeney yet transpired such that no "recovery" under the Retainer Agreement had yet occurred when Vinca discharged Former Counsel in March 2018. Basically, Former Counsel did not fully perform under the Retainer Agreement since Former Counsel did not satisfy the contingency prior to Former Counsel's discharge. Accordingly, the undersigned recommends that Former Counsel's request that a finding be made that Former Counsel met the contingency under the Retainer Agreement and that Former Counsel receive payment for the

49

entire $7,150,000 in attorneys' fees under the Retainer Agreement be denied.

**B.**     ***Quantum Meruit* Award**

Former Counsel alternatively asserts that, if the Court determines that compensation is not due under the Retainer Agreement because Former Counsel did not meet the contingency, Former Counsel should receive a *quantum meruit* award as a reasonable value for Former Counsel's services. Under Florida law, an attorney may be limited only to a *quantum meruit* recovery where an attorney rendered services for a client according to a contingency fee agreement but was discharged prior to the contingency being achieved. *Sohn v. Brockington*, 371 So. 2d 1089, 1093 (Fla. Dist. Ct. App. 1979). An attorney discharged *without cause* is entitled to a fee based on the reasonable value of services rendered prior to discharge, not to exceed the maximum fee provided in the fee agreement. *Rosenberg v. Levin*, 409 So.2d 1016, 1021 (Fla. 1982). If an attorney is discharged *for cause*, forfeiture of some or all the *quantum meruit* fee may be appropriate. *See, e.g., Kushner v. Engelberg, Cantor & Leone, P.A.*, 699 So. 2d 850, 851 (Fla. Dist. Ct. App 1997) (stating that "an attorney discharged for cause is entitled to the *quantum meruit* value of the services rendered less any damages which the client incurred due to the attorney's conduct and discharge"); *Searcy, Denney, Scarola, Barnhart & Shipley, P.A. v. Scheller*, 629 So. 2d 947, 954-55 (Fla. Dist. Ct. App 1993).

A court must consider the totality of the circumstances to determine the reasonable value of an attorney's services performed and fashion an award that is fair to both the attorney and the client. *See Badillo v. Playboy Entm't Grp., Inc.*, 302 F.

App'x 901, 903 (11th Cir. 2008).[16] In reviewing the totality of the circumstances, courts should consider factors "such as time, the recovery sought, the skill demanded, the results obtained, and the attorney-client contract itself[.]" *Rosenberg*, 409 So.2d at 1022. Factors relevant to the determination of the reasonable value of services rendered by an attorney will vary from case to case, but, most significantly, a court must consider any factors surrounding the professional relationship that would assist the court in fashioning an award that is fair to both the attorney and client. *Searcy*, 652 So.2d at 369 (listing factors such as the fee agreement between the client and attorney, the reason the attorney was discharged, actions taken by the attorney or client before or after discharge, and the benefit conferred on the client for consideration by the court). "The determination as to which factors are relevant in a given case, the weight to be given each factor and the ultimate determination as to the amount to be awarded are matters within the sound discretion of the trial court." *Id.*

### 1.   Former Counsel Did not Abandon or Withdraw from Vinca's Case

To determine if a *quantum meruit* award is appropriate the Court must first determine whether Former Counsel abandoned Vinca or whether Vinca discharged Former Counsel with or without cause. If Former Counsel abandoned Vinca prior to the occurrence of the contingency contemplated by the parties' Retainer Agreement, Former Counsel would not be entitled to any claim of attorneys' fees.

---

[16] Unpublished opinions are not considered binding precedent but may be cited as persuasive authority. 11th Cir. R. 36-2.

Conversely, if Vinca terminated Former Counsel with or without cause, a *quantum meruit* award would be appropriate.

"[W]hen an attorney withdraws from representation upon his own volition, and the contingency has not occurred, the attorney forfeits all rights to compensation." *Faro v. Romani*, 641 So.2d 69, 71 (Fla. 1994). "[C]ases have steadfastly emphasized that the withdrawing attorney forfeits all rights to compensation unless the attorney can show that *the client's conduct* made the withdrawal necessary." *Santini v. Cleveland Clinic Fla.*, 65 So.3d 22, 30 (Fla. Dist. Ct. App. 2011) (emphasis in original; citations omitted); *see also Benchmark Consulting, Inc. v. USAA Casualty Ins. Co.,* Case No. 8:18-cv-3134-T-24CPT, 2020 WL 5701750, at *5 (M.D. Fla. Sept. 24, 2020) (citations omitted) (stating that "the law in Florida has long been that an attorney's voluntary withdrawal from representation before the occurrence of the contingency contemplated by the parties' agreement forfeits that attorney's claim to compensation").

Here, Former Counsel asserts that Vinca discharged Former Counsel without cause (Doc. 489, at 10-14). On the other hand, Vinca asserts that he was *de facto* abandoned by Former Counsel or that Former Counsel effectively withdrew from his case (Doc. 487, at 6-10). Vinca asserts that Former Counsel acted in concert with each other in violation of the Retainer Agreement to effectuate a "plan" to remove Vinca's case from the Cohen Firm and take it to the Darken Firm contrary to the express obligations of the Rules 4-1.16 and 4-5.8 of the Rules Regulating the Florida Bar, which pertain to withdrawal and dissolution. Rule 4.1.16 states, in pertinent

part:

> **(a)    When Lawyer Must Decline or Terminate Representation.** Except as stated in subdivision (c), a lawyer shall not represent a client or, where representation has commenced, shall withdraw from the representation of a client if:
>
> ***
>
> (2) the lawyer's physical or mental condition materially impairs the lawyer's ability to represent the client[.]

R. Regulating Fla. Bar 4-1.16(a)(2). Rule 4-5.8 provides, in relevant part:

> **(c) Contact With Clients.**
>
> (1) *Lawyers Leaving Law Firms.* Absent a specific agreement otherwise, a lawyer who is leaving a law firm may not unilaterally contact those clients of the law firm for purposes of notifying them about the anticipated departure or to solicit representation of the clients unless the lawyer has approached an authorized representative of the law firm and attempted to negotiate a joint communication to the clients concerning the lawyer leaving the law firm and bona fide negotiations have been unsuccessful.
>
> (2) *Dissolution of Law Firm.* Absent a specific agreement otherwise, a lawyer involved in the dissolution of a law firm may not unilaterally contact clients of the law firm unless, after bona fide negotiations, authorized members of the law firm have been unable to agree on a method to provide notice to clients.
>
> **(d) Form for Contact With Clients.**
>
> (1) *Lawyers Leaving Law Firms.* When a joint response has not been successfully negotiated, unilateral contact by individual members or the law firm must give notice to clients that the lawyer is leaving the law firm and provide options to the clients to choose to remain a client of the law firm, to choose representation by the departing lawyer, or to choose representation by other lawyers or law firms.
>
> (2) *Dissolution of Law Firms.* When a law firm is being dissolved and no procedure for contacting clients has been agreed to,

> unilateral contact by members of the law firm must give notice
> to clients that the firm is being dissolved and provide options to
> the clients to choose representation by any member of the
> dissolving law firm, or representation by other lawyers or law
> firms.

R. Regulating Fla. Bar 4-5.8(c) & (d).

Vinca's argument focuses primarily upon Former Counsel's abandonment or withdrawal from Vinca's case because of Cohen's debilitating health and the effective closure of the Cohen Firm in January 2018 and the lack of proper advisement to Vinca about his right to counsel of choice upon Cohen's deteriorating health, upon Darken's departure, and upon the closure of the Cohen Firm. Vinca argues that, rather than acting with the transparency required under the Rules Regulating the Florida Bar, Former Counsel deliberately and surreptitiously attempted to avoid having to obtain Vinca's express consent to remain on the case by, amongst other things: (1) failing to timely advise Vinca about the status of Cohen's health and the status of the Cohen Firm; (2) seeking the advanced payment of attorneys' fees in December 2017 without properly advising Vinca about the Cohen Firm's financial troubles; (3) advising Vinca on January 2, 2018 that Cohen was ill and had to withdraw from the case but then later recanting Cohen's withdrawal in a January 18, 2018 e-mail; and (4) adding the Darken Firm as counsel of record in a March 13, 2018 filing with the Eleventh Circuit. Vinca asserts that such conduct exemplifies Former Counsel's "plan" to "circumvent detection and overcome [Vinca's] objection[,]" which constituted "the nefarious stuff of abandonment" (Doc. 487, at 9).

Regardless of whether Former Counsel properly complied with Rules 4-1.16 and 4-5.8 of the Rules Regulating the Florida Bar, and contrary to Vinca's arguments, the record demonstrates that Former Counsel did not actually nor ever intended to abandon or withdraw from Vinca's case. Undoubtedly, the attorney-client relationship between Vinca and Former Counsel reached a critical moment in January 2018, given the confluence of Cohen's health, the Cohen Firm's financial difficulties, Darken's departure from the Cohen Firm, and Vinca's concerns with Former Counsel. Cohen's health seemed severe enough to prompt Darken to initially inform Vinca on January 2, 2018 that Cohen needed to withdraw from Vinca's case, and the financial viability of the Cohen Firm was dire enough to force the Cohen Firm to terminate Darken and eventually all employees in January 2018. Further, the attorney-relationship between Former Counsel and Vinca was already frayed enough to prompt Vinca to seek advice from Current Counsel about his concerns with Former Counsel to prepare him for the volatile January 8, 2018 meeting with Darken. Following his consultation with Current Counsel, Vinca came armed with a list of grievances to confront Darken with at the January 8, 2018 meeting.

Nothing in the record indicates that Vinca believed Former Counsel abandoned him at the time of the January 8, 2018 meeting. Rather, he informed Darken that he contemplated firing Former Counsel and obtaining new attorneys. Upon learning from Vinca that he contemplated obtaining new attorneys, Former Counsel did not abandon or withdraw from the case, but instead Former Counsel

intensified efforts to keep Vinca as a client. Following the January 8, 2018 meeting, Darken hastily sent an e-mail in the evening hours as an attempt to persuade Vinca not to seek new counsel based on the potential financial impact of a charging lien (Doc. 491-84). In that e-mail, Darken made clear that Former Counsel intended to remain on the case unless fired, saying "[i]n any event, we need to know if you are discharging us" (Doc. 491-84).

On January 10, 2018, Darken continued efforts to convince Vinca to remain with Former Counsel by offering that, though Darken, Cohen, and Saady would not agree to reduce the 40% contingent fee, Darken was prepared, as part of a new fee agreement, to waive additional fees for work on any appeals (Doc. 492-2). From these actions, Former Counsel demonstrated that they desired to remain as Vinca's attorneys, as they maintained e-mail communication with Vinca to discuss his decision about Former Counsel (Docs. 490-29, at 530-33 & 538-41). Further, Vinca indicated he would continue with Former Counsel at a reduced fee rate, stating he remained "willing to let you continue to try and finish my portion of the case at a reduced rate of 30% with no additional appeal fees. … If the firm is willing to work something out, let me know" (Doc. 492-7, at 1-2). Despite the uncertainty about Vinca's intentions of remaining with Former Counsel, Former Counsel continued to work on Vinca's case until Vinca eventually discharged Former Counsel on March 21, 2018 (Docs. 490-29, at 527-29, 536-39, 563, 579-84, 587-96, 602-06, 611-16, 619, 624-25, & 632; 492-5; 492-6; & 492-9). Simply stated, Former Counsel made all efforts to keep Vinca as a client and did not abandon or withdraw from

Vinca's case. Upon this record, it is abundantly clear that Vinca discharged Former Counsel on March 21, 2018 (Doc. 485-28).

## 2. Former Counsel Was Discharged for Cause

The inquiry then turns to whether Vinca discharged Former Counsel with or without cause. As discussed above, an attorney discharged without cause is entitled to a fee based on the reasonable value of services rendered pursuant to *quantum meruit*, not to exceed the maximum fee provided in the fee agreement. *Rosenberg*, 409 So.2d at 1021. If the discharge is for cause, forfeiture of some or all the *quantum meruit* fee may be appropriate. *See Searcy*, 629 So.2d at 955. "[A] good faith reason asserted by the client may constitute cause to discharge an attorney." *Shackleford v. Sailor's Wharf, Inc.*, Case No. 8:15-cv-407-T-22-TBM, 2018 WL 10373434, at *4 (M.D. Fla. Jan. 19, 2018) (citations omitted); *see also Badillo*, 302 F. App'x at 904 (affirming a district court's determination that an attorney was discharged for cause under Florida law where the clients lost confidence in the attorney and that loss of confidence stemmed from the attorney's unprofessional conduct).

In this instance, Vinca asserts that he discharged Former Counsel for cause based upon Former Counsel's deficient performance within the case related to the VA claims, as well as Former Counsel's conduct regarding the failed mediation in September 2017, the gap loan, the statutory fees, the request for the payment of advanced attorneys' fees, Massari's participation in the case, and the lack of transparency about Cohen's health, Darken's departure, and the Cohen Firm's financial instability (Doc. 487, at 10-13). Though Vinca asserts a plethora of reasons

warranted the discharge of Former Counsel, the circumstances surrounding Darken's termination from the Cohen Firm in connection with the circumstances surrounding Cohen's health and the Cohen Firm's financial instabilities are sufficient enough to demonstrate that Vinca discharged Former Counsel for cause.

Starting mid-December 2017 and continuing through January 2018, the Cohen Firm unfortunately confronted dire circumstances, given Cohen's health and the Cohen Firm's significant financial obligations. These dire circumstances resulted in the firing of the Cohen Firm's employees, including Darken, and the eventual closure of the physical office space. Darken's departure proved paramount, as Darken was unquestionably the primary attorney on Vinca's case. Indeed, Darken's work was vital to Vinca's case, since he (1) drafted most, if not all, substantive filings submitted to the Court and to the DOJ; (2) provided the main point of communication with the DOJ and the other relators' attorneys; (3) functioned as the main point of contact for Vinca with Former Counsel, as Vinca did not meet Cohen until November 2016; (4) signed both the Retainer Agreement (Doc. 491-1) and the DOJ settlement agreement (Doc. 491-37) on behalf of Former Counsel; and (5) attended all settlement discussions.

Upon Darken's departure from the Cohen Firm, pursuant to Rule 4-5.8 of the Rules Regulating the Florida Bar, Vinca was immediately entitled to receive notice that Darken left the law firm and to receive notice of his options to choose to remain a client of the Cohen Firm, to choose representation by Darken, or to choose representation by other lawyers or other law firms. Given how instrumental Darken

was to Vinca's case, Darken's departure from the Cohen Firm, in and of itself, arguably sufficiently justified Vinca's discharge of Former Counsel for cause. Even so, the totality of the circumstances surrounding Darken's departure from the Cohen Firm demonstrate that Vinca terminated Former Counsel for cause.

As the record indicates, the Cohen Firm operated in a state of disarray at a critical point in Vinca's case. The Cohen Firm confronted significant financial stressors, and matters reached a catastrophic level when Cohen's health became a primary concern at the end of 2017. Given the desperation of the Cohen Firm's financial status, on December 15, 2017, Darken and Massari sought aid from Vinca and Sweeney by asking if they would make an advanced payment of attorneys' fees. Clearly this request was done, at least in part, due to the dire financial constraints confronting the Cohen Firm at that time. However, Vinca was not informed at that time why the request for the advanced fees was being made. Obviously, such information would have been important for Vinca to know, especially since the Cohen Firm was responsible to advance all costs of the *qui tam* litigation under the Retainer Agreement (Doc. 491-1 at 3).

Moreover, when the Cohen Firm terminated Darken in December 2017, Vinca received no information regarding the termination. Cohen advised Saady about Darken's departure in an e-mail on December 21, 2017, and she discussed it with Darken on that same day, but everyone chose to keep Vinca in the dark on the issue. Not until January 2, 2018, during a phone conference with Darken, Massari, and Saady, was Vinca informed that, due to declining health, Cohen would need to

withdraw from Vinca's case. The record does not clearly indicate whether Vinca received notice at that time that Darken was terminated from the Cohen Firm. Nor does the record clearly indicate whether Vinca received information regarding the Cohen Firm closing its office or the Cohen Firm terminating all other employees. Instead, Massari called Vinca immediately after the phone conference with Darken and Saady and attempted to reassure Vinca that everything would be fine with his case. Darken also clouded the matter by later informing Vinca that "Cohen's leukemia treatments now appear to be working. [Cohen's] condition has improved dramatically … Based on the change in his health, [Cohen] is no longer required to withdraw from your case by Florida Bar Rules. Accordingly, [Cohen now] has no intention to withdraw" (Doc. 492-8). Contrary to Darken's statement, nothing in the record indicates that Cohen ever handled any other matters on Vinca's case after mid-December 2017. In fact, the record shows that Cohen never communicated with Vinca in any way after mid-December 2017. If Cohen intended to remain on Vinca's case, it would have been logical for Cohen to maintain some form of communication with Vinca during this critical time, especially after Vinca told Darken that he contemplated retaining new lawyers. Finally, although Darken asserts that the Cohen Firm retained him as additional counsel on the Vinca matter, the record does not reflect when the Cohen Firm and Darken memorialized such agreement or communicated anything about such agreement to Vinca, if ever. Notably, it appears that such an agreement did not exist by at least February 2018, given that on February 9, 2018, Darken asked Massari "what do you think needs to

occur for me to represent … [Vinca] in the Court of Appeals," to which Massari responded "I think the fee agreement gives [Cohen] the right to staff the case as he sees fit" (Doc. 490-17). If Darken did not understand how he could represent Vinca before the Eleventh Circuit in February 2018, it is reasonable to conclude that Darken's role on the case remained un-clear to Vinca at that time.

As Vinca asserts, the record calls into question whether Former Counsel properly complied with Rules 4-1.16 and 4-5.8 of the Rules Regulating the Florida Bar in consideration of Darken's departure from the Cohen Firm, the status of Cohen's health, and the financial viability of the Cohen Firm. However, a determination as to whether Former Counsel properly complied with the Rules Regulating the Florida Bar need not be made to determine whether Vinca demonstrated cause to discharge Former Counsel. Regardless of any alleged Bar Rule violation, the record sufficiently demonstrates that Vinca had cause to terminate Former Counsel given Darken's departure from the Cohen Firm, the Cohen Firm's dire financial constraints and, unfortunately, Cohen's deteriorating health.

### 3.   Reasonable Value of Services Rendered by Former Counsel

Even though Vinca discharged Former Counsel for cause, the Court should still determine the reasonable value of services rendered by Former Counsel and then reduce such value by any damages suffered by Vinca. *See Kushner*, 699 So.2d at 851. In determining the reasonable value of Former Counsel's services, the undersigned considered several factors, including (1) the Retainer Agreement

between Former Counsel and Vinca; (2) the requisite skill necessary to initiate and purse Vinca's *qui tam* action, which included deftly navigating the perils of potential criminal exposure to Vinca and managing the complexities of settlement negotiations with Advanced Biohealing, the DOJ, and the five other relators; (3) Former Counsel's experience and skill in pursuing such *qui tam* actions; and (4) the benefit actually conferred by Former Counsel to Vinca.

The successful pursuit of a *qui tam* action requires significant skill, experience, resources, and time. The pursuit of a *qui tam* action can also prove especially daunting since a relator, like Vinca, may face potential criminal exposure. Former Counsel, especially Darken, who previously worked as a federal prosecutor, were seasoned and experienced attorneys in pursuing *qui tam* actions. Before executing the Retainer Agreement, Vinca already made statements to the FBI as well as statements on a hotline about the Advanced Biohealing kickback scheme. Given Vinca's participation in the kickback scheme as an employee of Advanced Biohealing, the unprotected statements could have put Vinca in serious peril of criminal charges. Darken quickly navigated the risk of criminal charges to Vinca by almost immediately scheduling an interview with the DOJ secured by the Proffer Letter. And, within a month of executing the Retainer Agreement, Darken successfully secured complete immunity from criminal charges for Vinca.

Additionally, Darken promptly submitted to the DOJ a thoroughly prepared and well-supported relator disclosure statement (Doc. 491-2). The day after providing the relator disclosure statement to the DOJ, the Cohen Firm filed the

Complaint (Doc. 491-4) on January 26, 2011, which was amended on March 10, 2015 with minor changes (Doc. 37), setting forth the legal theories relied upon until the conclusion of Vinca's case. As the DOJ investigated Vinca's allegations against Advanced Biohealing, Former Counsel continually provided valuable information to the DOJ in advancement of Vinca's case (Docs. 491-3; 491-10; 491-11; 491-12; & 491-13). Former Counsel also submitted detailed and well-researched memoranda to the DOJ in support of Vinca's case (Docs. 491-14; 491-16; 491-17; 491-18; 491-19; 491-20; & 491-21). From January 2011 until the execution of the Advanced Biohealing Settlement agreement in December 2016, Former Counsel expended significant time in researching and presenting Vinca's case for the DOJ's consideration (Docs. 491-22; 491-23; 491-24; 491-25; 491-26; 491-27; 491-28; & 491-29).

During this time, Vinca did not exhibit any displeasure with Former Counsel; rather, upon learning of the DOJ's settlement with Advanced Biohealing, Vinca expressed his satisfaction with Former Counsel (Doc. 485-2). Indeed, as noted, the Advanced Biohealing Settlement constituted the largest FCA recovery by the United States in a kickback case involving a medical device at that time (Doc. 491-36). In pursuit of Vinca's case, Former Counsel formulated a strategy that significantly impacted the DOJ's ability to secure such a large recovery from Advanced Biohealing. Although the DOJ's investigation into Advanced Biohealing ultimately resulted in a huge success, it must be recognized that Former Counsel accepted Vinca's case knowing that exceptional time, resources, and costs would

need to be expended in pursuit of the case shrouded against uncertainties about the eventual outcome of the case.

Most notably, the work of Former Counsel in 2017 conferred a substantial benefit to Vinca. As an initial matter, Former Counsel successfully obtained a satisfactory settlement of $385,000 for Vinca in resolution of his Retaliation Claim (Doc. 490-4). Further, after initial settlement discussions failed with the five other relators, Former Counsel expended significant efforts in maximizing the value of Vinca's recovery in the *qui tam* action (Docs. 491-38; 491-39; 491-40; 491-41; 491-43; 491-44; 491-45; 491-46; 491-47; 491-48; 491-49; & 491-50). As a result of Former Counsel's efforts, Vinca received the largest allotment of the settlement proceeds from the DOJ, at 55.155% (Doc. 491-51). Even though Vinca received such a substantial allotment of the settlement proceeds, Former Counsel remained focused and continued efforts to further maximize Vinca's potential recovery by vigorously attacking the other relators' cases (Docs. 491-52; 491-53; 491-57; 491-58; 491-59; & 491-60). Former Counsel then attempted to settle with the five other relators, with the objective of obtaining an allotment of 70% of the settlement proceeds. Although a global settlement with all relators proved unsuccessful in September 2017, Former Counsel pursued a novel and creative solution by negotiating solely with Harvey and securing an allotment of 74.5% of the settlement proceeds if the Court agreed with the DOJ's allotment of approximately 5% to the Remaining Relators (Doc. 491-63). Following entry of the Allocation Order, Former Counsel's efforts in negotiating with Harvey secured Vinca a potential 74.5% allotment of the Advanced

Biohealing Settlement proceeds, as compared to the 55.155% recommend by the DOJ and the 70% sought during the September 2017 settlement discussions.

Former Counsel's efforts continued in January 2018, despite the uncertainty of the attorney-client relationship between Vinca and Former Counsel. Based on his experience and skill, Darken was extremely successful in obtaining a 20% relator's share on behalf of Vinca and Sweeney, which constituted the highest percentage of any of the five other relators' shares (Doc. 492-9). The ability to secure such a significant relator's share for Vinca and Sweeney was not only attributable to Former Counsel's negotiation skills but also to Former Counsel's strategy, time, resources, and care in presenting the case for the DOJ's consideration over a period of six years. In fact, by January 2018, Former Counsel had positioned Vinca's *qui tam* action to recover a potential of $25,741,334.01,[17] absent any changed circumstances upon appeal.

Current Counsel entered an appearance in the case on March 28, 2018 (Doc. 161), and the notice of the Final Settlement Agreement by all relators was filed on April 23, 2019 (Doc. 204). The only substantive filings offered by Current Counsel in this matter prior to the April 23, 2019 settlement involved filings attacking Former Counsel's charging liens (*see* Docs. 170 & 172). The only substantive filing

---

[17] This calculation is based upon the total settlement proceeds amount of $345,521,261.92 identified in the Nicholson Letter (Doc. 491-51), the 74.5% share agreed to in the Second Settlement Agreement with Harvey (Doc. 491-63), and the 20% relator's share awarded to Vinca and Sweeney (Doc. 492-35), and then divided in half between Vinca and Sweeney, which is: $345,521,261.92 x 74.5% = $257,413,340.13 x 20% = $51,482,668.02/2 = $25,741,334.01.

made by Current Counsel in the appeal before the Eleventh Circuit involved Vinca's response brief filed on September 28, 2018 (Doc. 492-19). During the pendency of the appeal, a settlement, in principle, was initially announced in November 2018 (Unopposed Mot. for Adjournment of Briefing to Allow Parties to Finalize Settlement in Principle, *Advanced Biohealing, Inc.*, No. 18-10438 (11th Cir.) (filed on Nov. 9, 2018)), but Darken objected to the settlement on behalf of Sweeney on December 12, 2018 (Appellee Jennifer Sweeney's Notice to the Court and Mot. for Re-Setting of Date for Filing of Reply Briefs by Relators Medolla, Petty and Montecalvo, *Advanced Biohealing, Inc.*, No. 18-10438 (11th Cir.) (filed on Dec. 12, 2018)). Given Sweeney's objection to the settlement, the Eleventh Circuit stayed the appeal on January 23, 2019, and a limited remand was entered for the Court to determine whether an enforceable settlement agreement existed amongst all the relators (Doc. 173). While the limited remand remained pending, all the relators, including Sweeney, ultimately agreed to the Final Settlement Agreement on April 23, 2019 (Doc. 204). Current Counsel negotiated and secured Vinca a total recovery of $17,875,000 in the Final Settlement Agreement. Without question, Current Counsel secured such a recovery for Vinca based almost entirely upon Former Counsel's prior work. Given that Former Counsel previously positioned Vinca to recover potentially $25,741,334.01 upon a successful appeal, and that Current Counsel asserted no new legal theories, no challenges to the Court's Allocation Order or to DOJ's relator's share, and no objections to any results achieved by Former Counsel, the record clearly reflects that Former Counsel's prior work

formed the basis of the recovery obtained by Vinca in the Final Settlement Agreement.

In considering the work performed by both Former and Current Counsel in resolving Vinca's case, a reasonable and fair allocation for the work performed by each is 90% for Former Counsel's completion of the initial portion of the case and 10% for Current Counsel's completion of the remaining portion of the case. This percentage allotment in no way minimizes Current Counsel's efforts during the case. Rather, the allotment recognizes that Current Counsel's primary role involved participation in the settlement discussions that resulted in the Final Settlement Agreement with the other relators and that, without Current Counsel's skill and effort in resolving the matter with the other relators, Vinca's recovery could have been significantly delayed or resulted in a lesser amount. Although Current Counsel's efforts were necessary to conclude Vinca's case, the percentage allotment nonetheless recognizes that Former Counsel constructed the primary framework for Vinca's case. By way of analogy, consider if the matter was a cake. Former Counsel decided the type of cake to make, shopped for and mixed the ingredients, and then baked the cake, while Current Counsel completed the cake by frosting it. Just as in the cake example, where the essence of the cake was completed, but not finalized until it was frosted, the same is true for Vinca's case, in that the essence of the case was completed by Former Counsel's design and years of pursuit but the case was not finalized until Current Counsel was able to negotiate a full settlement with the other relators.

Based on the foregoing, the record shows that Former Counsel performed the vast majority of the work required to secure Vinca a recovery in this case. Former Counsel's skills and efforts for more than six years put Vinca in a position of strength, allowing him to negotiate and secure the Final Settlement Agreement in this case. Under these circumstances, a reasonable value of Former Counsel's services should be an amount commensurate with the percentage of services performed to obtain Vinca's ultimate recovery in the case at the 40% fee rate agreed upon by Vinca in the Retainer Agreement. Currently, the full 40% fee allotment in the amount of $7,150,000 remains in the Court's registry. Given that Former Counsel completed 90% of the work necessary to bring Vinca's case to resolution, the reasonable and fair value of Former Counsel's services should be valued at 90% of the $7,150,000, or $6,435,000.[18] Accordingly, the undersigned recommends that the reasonable value of Former Counsel's services be valued at $6,435,000.

### 4.    No damages based upon alleged malpractice

Next, the Court must determine whether the reasonable value of Former Counsel's services should be forfeited or offset by any damages suffered by Vinca. As Vinca correctly asserts, since Former Counsel was discharged for cause, any *quantum meruit* award can be forfeited either in total or, at a minimum, offset by his damages (Doc. 487, at 10-12). To reiterate, "an attorney who performed services on

---

[18] Vinca asserts that "[t]he Court should consider the totality of the circumstances, but under no circumstances should this Court reward [Former Counsel] above the actual lodestar analysis …" (Doc. 487, at 25). Upon this record, however, the undersigned finds that a lodestar analysis is inapplicable.

behalf of a client on a contingency fee basis and who is discharged before the contingency is accomplished may recover for services only in *quantum meruit*[,]" but "if the discharge is *for cause*, forfeiture of some or all of the *quantum meruit* fee may be appropriate." *Badillo*, 302 F. App'x at 902-903 (emphasis added) (citations omitted). If a client suffers damages caused by former counsel, then a court may consider reducing the *quantum meruit* award by the amount of damages suffered by the client. *See Searcy*, 629 So.2d at 954. If a client's damages exceed the *quantum meruit* fee, that would end the matter, but, if the client's damages do not exceed a *quantum meruit* fee award, "the court is then free to consider whether forfeiture of some or all of the *quantum meruit* fee as already reduced by the client's damages is appropriate under [the] circumstances." *Id.* at 955.

The client bears the burden of proving any damages resulting from former counsel's termination for cause. *Shackleford*, 2018 WL 10373434, at *3. Former counsel's *quantum meruit* fee can be reduced only by the amount of damages suffered by the client that resulted from former counsel's misconduct. *Searcy*, 629 So.2d at 954. In making this analysis, "the court should view this case from its posture at the time of the breach." *Id*.

According to Vinca, he suffered actual damages by Former Counsel's malpractice in failing to assert the VA claims in the Complaint (Doc. 487, at 13-16). Vinca contends that actual damages can be calculated based upon the amount lost by failing to allege the VA claims, which consists of the approximate 40% allotment of the Advanced Biohealing Settlement awarded to Harvey (Doc. 487, at 13-15).

69

Vinca argues that he and Sweeney provided Former Counsel sufficient information to assert the VA claims, "including witness contact information and reimbursement documentation-- to ascertain and confirm the identities of the nationwide, top-down kickback scheme to defraud victimized governmental agencies which, inexplicably, [Former Counsel] did not include in the Complaint" (Doc. 487, at 14). Vinca further argues that, even though Former Counsel should have included the VA claims in the Complaint, Former Counsel had many opportunities following the filing of the Complaint to investigate and add the VA claims in the subsequent Vinca Complaint filed in May 2018 (Doc. 487, at 15).

Indeed, the record reflects that Vinca informed Former Counsel about the potential VA claims and suggested Miller as a witness related to those claims (Doc. 491-8 & 491-9). Following that, Former Counsel identified Miller to the USAO and the DOJ as a potential witness (Docs. Doc. 491-2, at 6, & 491-10). Importantly, on March 5, 2011, Vinca e-mailed Darken under the subject "VA off-Label Usage" informing Darken that "there is a ton of off label usage within the VA Hospitals" and that "[s]uch practices were suggested to Tommy Miller" (Doc. 491-8, at 1-2). Darken responded to Vinca's email on March 23, 2011 and stated that "[w]e need to be able to allege that Advanced Biohealing was knowingly selling off-label to VA hospitals. … Can you give me any additional facts that would help" (Doc. 491-8, at 1). Vinca responded to Darken by stating that deposing witnesses like Miller should help with the VA claims but that he could not think of any further details that would help because he was not a VA representative (Doc. 491-8, at 1).

The March 2011 e-mail exchange between Vinca and Darken illustrates Vinca's lack of independent facts to provide Former Counsel regarding the VA claims. Vinca's representations about the VA claims to Former Counsel were solely based upon information and belief, which is insufficient as the Eleventh Circuit has rejected FSA allegations based on information and belief. *Corsello v. Lincare, Inc.,* 428 F.3d 1008, 1013-14 (11th Cir. 2005); *see United States ex rel. Clausen v. Lab'y Corp. of America, Inc.,* 290 F.3d 1301, 1310 (11th Cir. 2002), *cert. denied*, 537 U.S. 1105 (2003). Additionally, placeholder allegations regarding the VA claims would have likely proved futile in precluding an award to relator Harvey in this case. *See, e.g., United States ex rel. Heineman-Guta v. Guidant Corp.,* 718 F.3d 28, 38 (1st Cir. 2013) (concluding that "[a] first-filed complaint that failed to [properly allege essential facts] would not preclude a later-filed complaint that does allege the essential facts of the alleged fraud"); *United States ex rel. Acad. Health Ctr., Inc. v. Hyperion Found., Inc.,* Civil Action No. 3:10-CV-552-CWR-LRA, 2014 WL 3385189, at *33 n.51 (S.D. Miss. July 9, 2014) (concluding that "the Relator did not allege FCA violations—other than at Oxford—in more than a conclusory fashion. Relator's allegations did not allow the United States meaningfully to investigate, no less sue, Defendants under the FCA. They do not, therefore, entitle the Relator to stake a claim to share in any FCA recovery the United States might ever obtain from Defendants' conduct at other nursing homes.").

Essentially, Vinca asserts that Former Counsel breached the Retainer Agreement by committing malpractice in failing to interview witnesses, such as

Miller, to gather sufficient information to form the basis of VA claims on Vinca's behalf (Doc. 487, at 15-17). "Under Florida law, a cause of action for legal malpractice has three elements: (1) the attorney's employment; (2) the attorney's neglect of a reasonable duty; and (3) the attorney's negligence was the proximate cause of loss to the client." *In re Witko*, 374 F.3d 1040, 1043-44 (11th Cir. 2004) (citation and internal quotation marks omitted). Interestingly, while arguing that Former Counsel improperly failed to obtain record evidence from Miller and other witnesses, Vinca likewise failed to provide any evidence from Miller or any other witness, such as witness statements, related to the VA claims to support his claim of malpractice. Vinca failed to offer any evidence suggesting that, if Former Counsel contacted Miller or other witnesses in March 2011, those witnesses would have been cooperative and would have provided information Former Counsel could have relied upon to assert the VA claims. On this record, determining what information Miller or any other witness could have provided related the VA claims is merely speculative.

Regardless, even if Vinca presented evidence during the five-day evidentiary hearing that Miller or any other witness would have cooperated with Former Counsel and provided useful information in support of the VA claims, such evidence would still be insufficient, given that, in making a damages analysis, a court views the case from its posture at the time of any breach. *Searcy,* 629 So.2d at 954. In other words, the Court should examine what Former Counsel knew at the time of the filing of Vinca's *qui tam* action. Here, it was unknown if any witness

would have agreed to speak to Former Counsel about a federal kickback scheme that such witnesses may have participated in themselves while employed at Advanced Biohealing. More importantly, it was unclear whether any witness, such as Miller, would have refused an interview request by Former Counsel and notified Advanced Biohealing about Former Counsel's inquiry. Such uncertainty could have resulted in potentially devastating consequences for Vinca's *qui tam* action. For example, notice to Advanced Biohealing might have drastically impacted the DOJ's ability to conduct a successful undercover investigation in the matter, which then could have impacted the DOJ's opinion about any settlement allotment or relator's share for Vinca.

In sum, Vinca failed to produce sufficient evidence to demonstrate how Former Counsel's decision not to interview Miller or other witnesses about the VA claims was negligent. Moreover, given the uncertainty about the actions any potential witness may have taken if contacted by Former Counsel, Former Counsel's decision not to approach Miller or any other witnesses about the VA claims appears reasonable on this record. Vinca thus failed to demonstrate any damages related to the VA claims.

### 5. Forfeiture based upon alleged misconduct

In addition to asserting actual damages resulting from Former Counsel's alleged malpractice, Vinca also asserts that any *quantum meruit* fee award should be forfeited in total or in part based upon Former Counsel's misconduct. Vinca contends that Former Counsel committed misconduct by: (1) putting Former

Counsel's financial interest ahead of Vinca's interest when failing to reduce the settlement demand during the September 2017 mediation; (2) allowing Massari to engage in the unlawful practice of law; and (3) failing to be fully transparent regarding Cohen's health and the Cohen Firm's financial viability while attempting to induce Vinca to obtain an additional loan to pre-pay attorneys' fees (Doc. 487, at 17-23). Vinca argues that the egregiousness of Former Counsel's misconduct warrants a forfeiture of any *quantum meruit* award (Doc. 487, at 24-25).

Under Florida law, courts should consider various factors when determining whether an attorney's misconduct warrants a forfeiture of a fee award, including but not limited to: (1) the extent of the misconduct, *i.e.*, whether the attorney committed repeated or continuing violations or just a single incident of misconduct; (2) whether the attorney knowingly committed the misconduct; (3) the extent of the harm, if any, to the client from the attorney's misconduct, including intangible harm, such as the client's loss of trust in the attorney's loyalty and good faith; (4) the adequacy of other remedies; and (5) the timing or place of the attorney's misconduct in the sequence of events and the resulting effects on the client. *See Searcy,* 629 So.2d at 952-53 (citation omitted). Ultimately, a

> fee forfeiture is not an automatic remedy, even for serious transgressions. Forfeiture of all fees is the final remedy, one to be hesitatingly applied only when no other remedy will fairly vindicate the unique standards of conduct to which lawyers have sworn fealty. While a court should not shrink in a proper case from denying all compensation to an offending lawyer, it should do so only after exhausting the aptness of all other remedies to cure the specific act of misconduct in issue.

*Id.* at 953. Courts should not act in the role of a "lawyer disciplinary process, which

74

belongs in another forum. Rather [the court's] role is to ask whether the ordinary legal remedies will fairly do in upholding the high standards governing lawyers." *Id.* Punishment of an attorney, "if it should come at all, lies instead with the Bar disciplinary process." *Id.* at 954.

As to this issue, Vinca first claims that Former Counsel prioritized Former Counsel's financial interests over Vinca's interests, when Former Counsel advised against reducing Vinca's and Sweeney's settlement demands in September 2017, while suggesting that Vinca obtain a gap loan (Doc. 487 at 15-16). As discussed, the record reflects that the Cohen Firm faced dire financial consequences at the end of 2017, and, when faced with the financial constraints and the deteriorating health of Cohen, the Cohen Firm terminated all employees in early 2018. Given those circumstances, Vinca's argument that the Cohen Firm's conduct was guided by financial self-preservation is not without merit. Even so, the record also demonstrates that Former Counsel's advice about waiting to communicate a reduced settlement demand to the DOJ immediately after the failed September 2017 mediation was sound, appropriate, and, eventually, fruitful advice.

As detailed above, following the failed mediation in September 2017, Vinca expressed frustration and panic given his financial circumstances, which prompted him and Sweeney to communicate to Former Counsel their desire to reduce their settlement demand to a 55% allotment. Vinca contends that he "regularly felt unheard and ignored by [Former Counsel] after repeatedly instructing them to reduce their settlement demand, but he was rebuffed, and shunted aside with

promises of a gap loan which terms ultimately exploited his desperation" (Doc. 487, at 3). Contrary to Vinca's assertion, however, Former Counsel fully advised Vinca and Sweeney about the potential ramifications of going back to the other relators immediately with a reduced settlement demand. Notably, after a passionate discussion about the matter, Vinca and Sweeney agreed to wait before reducing their settlement demand. Namely, after the failed September 2017 mediation, Former Counsel held a phone conference with both Vinca and Sweeney, during which Vinca and Sweeney agreed to wait to initiate any further settlement discussions until the DOJ filed an omnibus response to the pending motions and the district judge ruled on the pending motions. Further, Cohen followed-up with Vinca and Sweeney and expressed his understanding with their frustration about the failed mediation but also reiterated his advice to wait until the Court ruled on the pending motions before reinitiating settlement discussions (Doc. 485-50). Upon the advice of Former Counsel, Vinca and Sweeney decided not to reinitiate the settlement discussions with a lower settlement demand. Significantly, Vinca and Sweeney did not suffer harm by waiting to reinitiate settlement talks, as their position of strength in the case increased greatly due to Former Counsel's efforts in securing the Second Settlement Agreement with Harvey, the Court's Allocation Order, and the agreement with the DOJ for a 20% relator's share for Vinca and Sweeney.

While Vinca attempts to cast a shadow over Former Counsel's actions in aiding Vinca to obtain a gap loan, the record demonstrates that Vinca expressly requested Former Counsel's aid in identifying lenders for the gap loan, and Former

Counsel identified such lenders. Cohen told Vinca that "I know that a salient concern is your financial plight until this matter resolves one way or the other. Although it is unethical for firms to advance money to clients under these circumstances, there do exist companies which advance money at a substantial interest rate, which you may want to consider using in this case" (Doc. 485-50). Former Counsel did not require Vinca to obtain the gap loan, did not dictate that Vinca obtain the gap loan from a specific lender, did not negotiate the final terms of the gap loan, and did not make any money from the gap loan. Rather, Vinca obtained the gap loan on his own because of his financial hardship during the pendency of the case (s*ee* Docs. 490-12; 491-64; 491-65; 491-66; 491-67; 491-68; & 491-69).[19]

In addition, Vinca implies that Former Counsel should have allowed Vinca to avail himself of the $92,000 in statutory fees to aid his financial plight rather than suggest to Vinca that he obtain a gap loan. Vinca argues that Former Counsel "should have been holding in trust a greater amount in *qui tam* statutory attorney's fees than Vinca borrowed, but Vinca was never given a statement confirming that his $92,000 statutory attorney's fee award had been received, was credited and

---

[19] Vinca continually asserted to Former Counsel that he experienced significant financial stressors due to his unemployment resulting from his *qui tam* case, but, around the beginning of 2017, Vinca was purchasing his "dream home" when he recovered $385,000 for his retaliation claim. Notably, Vinca's financial troubles were likely complicated by his divorce, which divorce required Vinca to pay his ex-wife 25% of his "whistleblower claim" (Doc. 492-48). After discussing the issue, Darken advised Vinca to have his divorce lawyer obtain a court order to clarify what was required to be paid to his wife from his *qui tam* case (Doc. 492-48). The record remains silent as to whether Vinca ever sought such clarity.

applied, or was being held in [the Cohen Firm's] trust" (Doc. 487, at 16). Although Vinca complains about a lack of notice regarding the statutory fees, the record demonstrates that Vinca knew that the Cohen Firm obtained $92,000 in statutory fees because he specifically asked whether he could obtain the fees to aid him in securing property to build his dream home with a tennis court (Doc. 490-5). Notably, Vinca maintained no claim to the statutory fees under the Retainer Agreement, which provided that "[f]ees awarded by the court or arbitrators or paid by a defendant will be credited against the sums due from the CLIENTS" (Doc. 491-1, at 3). This provision entitled Vinca to a $92,000 offset from any *quantum meruit* fee award but not an entitlement to obtain those monies to build his dream home in February 2017 or to assist him in resolving his financial issues in September 2017.

As for his complaints related to Former Counsel not reducing his settlement demands after the failed September 2017 mediation, Vinca failed to produce any evidence that the other relators would have accepted the reduced settlement offer of a 55% allotment if Former Counsel had communicated the offer to the other relators in September 2017. Importantly, Vinca's "floor" was 55%" in 2017 (Doc. 491-62), but he was only able to secure in the Final Settlement Agreement in 2019 a 54.3% allotment.[20] Significantly, the Final Settlement Agreement was negotiated after Former Counsel secured the Second Settlement Agreement with Harvey, entry of

---

[20] Vinca and Sweeney received a total award of approximately 54.3% of the proceeds disbursed, which consisted of $35,750,000 of the total $65,896,000 disbursed from the Court registry (Doc. 229).

the Court's Allocation Order, and the DOJ's approval of a 20% relator's share for Vinca, none of which existed in September 2017. Thus, it appears unlikely that even if Former Counsel had made the reduced offer to the other relators it would have been accepted. Although the Cohen Firm experienced dire financial circumstances at the end of 2017, those circumstances alone are insufficient to establish that Former Counsel committed misconduct by failing to reduce Vinca and Sweeney's settlement demand in September 2017. Rather, on this record, Former Counsel provided competent advice about waiting to reinitiate settlement talks until the Court resolved the pending motions. Accordingly, Former Counsel did not commit misconduct related to reducing the settlement demand in September 2017, procuring the gap loan, or failing to provide Vinca the statutory fees.

Next, Vinca argues that forfeiture of the *quantum meruit* fee award is appropriate based upon Former Counsel permitting Massari to commit the unauthorized practice of law in Vinca's case in violation of Chapter 454 of the Florida Statutes and Rules 3-6.1 and 10-2.1 of the Rules Regulating the Florida Bar. Massari was disbarred from the practice of law in 2002 for fraudulently obtaining client funds, misappropriating those funds, and then concealing his misconduct by uttering forged instruments. *The Fla. Bar v. Massari*, 832 So.2d 701, 707 (Fla. 2002). Indeed, Vinca asserts that Massari engaged in several activities pertaining to Vinca's case which may be in violation of his disbarment, such as: directly contacting Vinca

and Sweeney to discuss issues in their case;[21] attending and actively participating in mediations on behalf of Vinca and Sweeney; holding discussions about Vinca and Sweeney's case with counsel for the other relators; discussing the fee arrangement with Vinca and Sweeney; and soliciting prepayment of attorneys' fees from Vinca and Sweeney (*see, e.g.*, Docs. 490-5; 490-6; 490-7; 490-8; 490-17; 491-65; 491-66; & 491-76).

Vinca asserts that Massari fraudulently represented himself as an attorney and that he was never informed by Former Counsel that Massari was a disbarred attorney (Doc. 487, at 17-23). Vinca further contends that since Massari was supervised by the Cohen Firm, the Cohen Firm "intentionally propounded" Massari's unauthorized practice of law (Doc. 487, at 20). Vinca argues that the record demonstrates, at a minimum, the Cohen Firm's knowledge that Massari was engaged in the unlawful practice of law, given that Cohen and Darken were largely copied and included on all pertinent e-mails with Massari, attended mediations and engaged in conference calls with Massari, and instructed Massari to directly contact Vinca and Sweeney (Doc. 487, at 20).

Relying upon *Goldberg v. Merrill Lynch Credit Corp.*, 35 So.3d 905 (Fla. 2010), Vinca asserts that the unauthorized practice of law should be a basis to forfeit a *quantum meruit* award (Doc. 487, at 22). In *Goldberg*, the Florida Supreme Court concluded that a former client may pursue a private civil action against an

---

[21] Rule 3-6.1(d)(1) of the Rules Regulating the Florida Bar specifically prohibits a disbarred attorney from having "contact (including engaging in communication in any manner) with any client."

unlicensed practitioner to recover fees and damages. 35 So. 3d at 907. To state a cause of action for damages under any legal theory arising from the unauthorized practice of law, a former client must allege a specific activity that has been recognized by the Florida Supreme Court as the unauthorized practice of law. *Id.* Vinca argues, in reliance upon *The Fla. Bar v. Dobbs*, 508 So.2d 326, 327 (Fla. 1987), that Massari's representation of himself as a lawyer constituted the practice of law, but Vinca otherwise appears to focus his argument upon Former Counsel's misconduct in managing and supervising Massari under Rule 3-6.1 of the Rules Regulating the Florida Bar (Doc. 487, at 19).

Regardless of Vinca's theories of the unauthorized practice of law and whether he can establish any of the theories, a total forfeiture of any *quantum meruit* award under the circumstances of this case would be inappropriate for three reasons: (1) Former Counsel's work conferred a substantial benefit to Vinca; (2) Vinca suffered no actual damages by any of the alleged unlicensed activities, and (3) there are better forums to adjudicate Vinca's claims related to Massari's unlawful practice of law. As an initial matter, Former Counsel performed substantial work on Vinca's case without Massari's participation. In fact, it appears that Vinca first met Massari during the January 2017 initial mediation. Further, Massari's role on Vinca's case mostly was limited to following the directives of either Darken or Cohen. Of note, Vinca does not identify any activities by Massari that caused actual damage to the financial outcome of Vinca's case. Rather, it appears quite the opposite since Massari's suggestion for the percentage allotment matrix for the Second Settlement

Agreement with Harvey enhanced the potential value of Vinca's case. Under these circumstances, even if accepted as proven, Vinca's allegations pertaining to the unauthorized practice of law by Massari do not warrant a total forfeiture of the *quantum meruit* award, as such a result would be an unjust windfall for Vinca given the substantial benefit of work performed by Former Counsel on Vinca's case and the lack of tangible harm to Vinca from Massari's participation on the case.

If Massari committed the unlawful practice of law, such conduct should not be rewarded but rather sanctioned. However, other appropriate forums exist where a record could be more fully developed to determine whether Massari committed the unlawful practice of law, whether Former Counsel enabled such activity, and what sanction, if any, is warranted. *See Searcy,* 629 So.2d at 953-54 (stating that a court does not act as a "lawyer disciplinary process" and that such activity should occur in a different forum, such as the Bar disciplinary process, while the court should determine whether the ordinary legal remedies will fairly uphold the high standards governing lawyers). Notably, Vinca already pursued Massari's alleged unlawful practice of law in state court, in which he asserted claims for malpractice. *See Vinca v. Cohen*, No. 18-CA-7935 (Fla. Cir. Ct. Dec. 28, 2018) (Vinca's Amended Complaint raising claims of professional negligence and unjust enrichment against Cohen, Darken, and Saady and *respondeat superior* claims against Former Counsel, the Barry A. Cohen Legal Team, and the Darken Firm, based, in part, on hiring and using Massari to perform legal services). Further, Massari petitioned the Florida Supreme Court for disciplinary revocation without leave to seek readmission, which was

granted by the Florida Supreme Court. *See In re: Massari*, CASE NO.: SC19-1347, 2019 WL 5624587, at *1 (Fla. Oct. 31, 2019). Here, the record seems lacking given that the focus of the alleged unlawful practice of law is on Massari's alleged misconduct, yet Massari was not called as a witness during the evidentiary hearing. Significantly, forfeiture of any fee award in this proceeding should not be designed solely as a punitive disciplinary sanction. Instead, the Court ultimately must consider the totality of the circumstances to determine the reasonable value of Former Counsel's services performed and fashion an award that is fair to both Former Counsel and to Vinca.

Although Vinca failed to establish that any of Massari's alleged actions that he contends constitute the unauthorized practice of law caused any tangible harm, Vinca sufficiently established that he suffered intangible harm in the form of lost trust in Former Counsel's loyalty and good faith. *See Searcy,* 629 So.2d at 952 (citations omitted) (stating that forfeiture may be justified even when the client suffered no harm, or the harm was of little consequence, since the harm may be intangible, *e.g.*, the client's loss of trust in the lawyer's loyalty and good faith). This intangible harm connected to Massari's role on the case is directly linked to Vinca's lost confidence in Former Counsel predicated upon the Cohen Firm's financial instability, Cohen's health, and the communications from Former Counsel related to both those issues and Darken's departure from the Cohen Firm. As discussed more fully above, Vinca justifiably terminated Former Counsel for cause given the circumstances surrounding the Cohen Firm's financial viability, Cohen's health,

and Darken's departure from the Cohen Firm. Those circumstances, coupled with the circumstances surrounding Massari's actions on Vinca's case, justifiably caused Vinca to lose confidence in Former Counsel. The record reflects that Vinca knew about all these issues, as he sought advice in January 2018 from outside counsel on how to proceed forward in the case with Former Counsel. Notably, Vinca considered and weighed each of his issues with Former Counsel, but Vinca ultimately offered to allow Former Counsel to remain on the case and release any claims against Former Counsel if Former Counsel agreed to a reduced rate of 30% with no additional appellate fees (Doc. 492-7). Vinca's offer suggests that his lost confidence in Former Counsel could have been cured by financial remedies. However, given Massari's participation on his case, Cohen's health and the Cohen Firm's financial instability, Vinca chose to terminate Former Counsel, even though such termination resulted in harm to Vinca, as he was required by the circumstances to obtain new counsel. Nonetheless, Former Counsel bears responsibility for any such harm, as it was solely the conduct of the Cohen Firm that caused the circumstances resulting in the termination of the attorney-client relationship between Vinca and Former Counsel.

Vinca's need to retain new counsel under these circumstances caused Vinca harm. *See Badillo,* 302 F. App'x at 903-04 (affirming a district court's finding that excess fees to new counsel would be unfair and might be considered damages). In *Badillo*, the Eleventh Circuit did not specifically classify fees paid to new counsel as damages or forfeiture. *Id.* at 903-04. Rather, the Eleventh Circuit mainly was

satisfied that the district court focused on the totality of the circumstances to fashion an award that was fair to both the attorney and his former clients. *Id.* at 904. In his brief, Vinca did not request any fees for Current Counsel as damages. Irrespective, Vinca suffered intangible harm caused by the circumstances created by the Cohen Firm, which prompted Vinca to retain Current Counsel at additional costs and likely further delay his case. Such harm warrants an additional forfeiture of a portion of the *quantum meruit* award. The undersigned therefore recommends that, whether classified as damages or forfeiture, under the circumstances of Vinca's lost confidence in Former Counsel, which led Vinca to obtain Current Counsel near the conclusion of his case, an additional 3% reduction from the $7,150,000 should be applied. The additional 3% reduction is fair to both Former Counsel and Vinca when considering the extent of the harm to Vinca was primarily intangible; the value of Former Counsel's services already has been reduced by 10% in consideration of Current Counsel's work on the case; and the timing of Former Counsel's alleged misconduct occurred was nearly at the conclusion of the case with very limited impact upon the economic value of Vinca's recovery. *See Searcy,* 629 So.2d at 952-53. Accordingly, the undersigned recommends that $214,500 ($7,150,000 x .03) be subtracted from the *quantum meruit* award in consideration of the intangible harm caused by Former Counsel.

## IV.   Conclusion

To summarize, the undersigned recommends that the reasonable value of Former Counsel's services be valued at $6,435,000. In consideration of the

intangible harm suffered by Vinca, however, it is recommended that the $6,435,000 award be reduced by $214,500, leaving a total of $6,220,500. Finally, it is recommended that the $6,220,500 be offset by the previously obtained $92,000 statutory fees for a total *quantum meruit* award to Former Counsel in the amount of $6,128,500.

For the foregoing reasons, it is hereby

RECOMMENDED:

1. In consideration of the totality of the circumstances, $6,128,500 be awarded to Former Counsel as a *quantum meruit* award that is fair to both Former Counsel and Vinca in satisfaction of Former Counsel's charging liens (Doc. 167).

2. Upon entry of a fair *quantum meruit* award, the matter be referred to the undersigned to resolve how the monies should be distributed from the Court registry.[22]

IT IS SO REPORTED in Tampa, Florida, on this 29th day of November 2021.

_____
ANTHONY E. PORCELLI
United States Magistrate Judge

---

[22] The undersigned denied without prejudice and thus deferred ruling on Non-Party Counsel Financial Services, LLC's Motion to Intervene Pending Resolution of Former Counsel's Charging Liens (Doc. 494). In his brief, Vinca requests that "any award … be retained by the Court pending the outcome of the [state] malpractice claims" (Doc. 487, at 25). Though the undersigned appreciates Vinca's position, Vinca provides no authority for such relief in connection with a charging lien, and, without comment on the merits of such a request, Vinca's request for restraint of the monies appears better suited for the state malpractice action.

## NOTICE TO PARTIES

A party has fourteen days from the date they are served a copy of this report to file written objections to this report's proposed findings and recommendations or to seek an extension of the fourteen-day deadline to file written objections. 28 U.S.C. § 636(b)(1)(C). A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. See 11th Cir. R. 3-1; 28 U.S.C. § 636(b)(1). **Should the parties wish to expedite the resolution of this matter, they may promptly file a joint notice of no objection.**

cc:    Hon. James S. Moody, Jr.
          Counsel of Record